**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Henry SIVILS (90–6366); Jerry Stokes (90–6375); William Dillard (90–6376); and Sherrill Jordan (90–6420), Defendants–Appellants.**

Nos. 90–6366, 90–6375, 90–6376 and 90–6420.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 13, 1991.

Decided March 31, 1992.

Joseph M. Whittle, U.S. Atty., Terry Cushing, Monica Wheatley (argued and briefed), Asst. U.S. Attys., Louisville, Ky., for plaintiff-appellee.

Rickie A. Johnson (argued and briefed), Symsonia, Ky., for defendant-appellant Henry Sivils.

E.W. Rivers (argued and briefed), Paducah, Ky., for defendant-appellant Jerry Stokes.

Carol W. Johnson (argued and briefed), Hopkinsville, Ky., for defendant-appellant William Dillard.

Len W. Ogden, Jr. (argued and briefed), Paducah, Ky., for defendant-appellant Sherrill Jordan.

Before: KENNEDY and JONES, Circuit Judges; and CONTIE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendants Henry Sivils, Jerry Lee Stokes, William Dillard, and Sherrill Jordan appeal their jury convictions for conspiracy to possess with intent to distribute cocaine (Sivils, Dillard, and Jordan) and conspiracy to convert government property to own use (Stokes and Dillard). Sivils also appeals from his guilty plea to use of a firearm during a drug offense. For the reasons that follow, we affirm.

I

During the months of August and September 1989, Christian County (Kentucky) Sheriff William Dillard and his deputy, Sherrill Jordan, participated in two conspiracies to violate federal law. The first conspiracy, in which their associate and former Special Deputy Sheriff Jerry Stokes also participated, resulted in the conversion of $12,000 in United States government funds. The second, in which Dillard and Jordan enlisted the aid of Henry "Bubba" Sivils, culminated in the apparent purchase of one kilogram of cocaine.

George Art Davis arrived in Hopkinsville, Kentucky in April 1989, acting as an undercover cooperating witness for the Federal Bureau of Investigation and the Kentucky State Police. Davis soon opened an electronics repair shop as his "cover" to facilitate his intelligence gathering. The shop was equipped with audio and video surveillance equipment, and on occasion, Davis wore a body recorder to record off-site conversations.

Davis met Stokes first, in June 1989, and Davis made it known that he was interested in being involved in criminal activity. Stokes operated a carnival gambling booth on the outskirts of town. He had a reputation as "a guy that knew everybody and that had a lot of connections." J.A. at 202.

Stokes indeed had been a friend of Sheriff Dillard for over a decade, and Stokes boasted openly of his influence with Dillard. Dillard had commissioned Stokes as a Special Deputy and had given him a badge. Stokes was fond of displaying the badge and pretending to place people under arrest.

Stokes introduced Davis to Sheriff Dillard on August 9, 1989. Dillard had been a police officer for over twenty years and a sheriff for seven years. Dillard quickly provided Davis a list of police officers most inclined to arrest persons they suspected of criminal activity. Dillard then professed his admiration for a diamond ring that Davis was wearing, and Dillard took the ring with him at the conclusion of that first meeting. Dillard never paid for the ring. Dillard later asked a jeweler to appraise the ring and was told it was worth $2,000.

On the way to that first meeting, Stokes had told Davis that "whatever Mr. Dillard wants give it to him," promising Davis that they "would make a lot more than anything would cost." *Id.* at 204. Davis's ring was only the first item of value that Dillard received. Dillard accepted five additional diamonds from Davis at an August 16, 1989 meeting. These diamonds were later added to the ring that Dillard had obtained from Davis, increasing the ring's total value to about $5,000. Dillard also "borrowed" an automobile radar detector displayed in Davis's shop. Dillard did not return the radar detector and later told Davis that someone had stolen the equipment from his car. Dillard asked for, and received, $700 cash, which he used for a trip to Louisiana.

Jordan also pressed Davis for "gifts." Jordan obtained $100 from Davis on September 1, 1989, an amount he never repaid. Jordan later received a $500 payment in return for investigating the supposed theft of Davis's truck. Jordan kept half that money; Dillard helped him spend the rest at a sheriffs' association meeting in Nashville.

The first conspiracy, as charged in count one, began to solidify in the middle of August 1989. On August 16, Davis spoke with Dillard regarding a drug transaction that Davis was considering with a Hopkinsville drug dealer. Dillard vouched that the dealer was "a good guy." *Id.* at 155. Davis told Stokes of the drug proposal the next day. Stokes suggested that Davis delay any action with the other drug dealer until Dillard, Stokes, and Davis could discuss the deal together. The three then met on August 21, 1989. At that meeting, Stokes claimed he could buy one-half kilogram of cocaine in Memphis, Tennessee for $12,000. Davis obtained the required funds from the FBI soon thereafter, and the deal was under way.

Stokes, Dillard, and Davis gathered in Davis's shop the afternoon of August 28, 1989. Davis gave Stokes the $12,000 Stokes had requested. It had been decided that Stokes would use Davis's truck for the trip to Memphis. Accordingly, Davis drove his truck to Stokes' house in Franklin, Kentucky and left it for Stokes to use. Stokes testified that Davis later asked for the money back. Stokes said he would like to keep $1,000 to use as a down payment for the drugs in Memphis, and Davis agreed. Davis testified, however, that Stokes never gave any money back. In any event, Jordan met Davis at Stokes' house and drove Davis back to Hopkinsville in Jordan's police cruiser.

Stokes and his wife left for Memphis the next morning, August 30, 1989. Stokes interrupted his trip with a stop in Albany, Kentucky. While there, Stokes and some other people removed the trailer hitch from Davis's truck. Stokes later offered to sell the hitch to his friend Dallas Booth in Memphis, Tennessee.

Stokes arrived at Booth's home in Memphis on the afternoon of September 1, 1989. Stokes boasted that he was "pulling a scam" on Davis, *id.* at 263, and that Stokes had shared or would soon share part of the $12,000 with Dillard. Jordan would later admit that he received $300 for his role in the Memphis scheme.

Stokes continued his swindle on September 2, 1989. In the early morning hours, Stokes phoned Davis to tell him that the drug purchase had been successfully com-

pleted. A few hours later, Stokes abandoned Davis's truck in a Memphis car lot and drove away with Booth. Stokes then reported the truck stolen to the police and told Davis that "the stuff's gone." *Id.* at 208. Stokes returned to Franklin, Kentucky, where Dillard and Jordan picked up Stokes and his wife and drove them back to Hopkinsville.

Despite the alleged "failure" of the Memphis drug deal, Dillard and Jordan began discussions with Davis on September 12, 1989, which would result in the second conspiracy. Davis informed the two that he had a drug source in Bowling Green, Kentucky—who in reality was an undercover Kentucky State Police detective—willing to sell a kilogram of cocaine. Davis requested that Dillard and Jordan provide field drug testing kits for the purpose of evaluating the purity of a sample of the Bowling Green cocaine. Jordan provided these kits on September 18.

Dillard, Jordan, and Davis gathered again in Davis's shop on September 19, 1989 to test the cocaine sample. Pursuant to court authorization, a one-eighth ounce sample of cocaine had been furnished by the Kentucky State Police for this purpose. Dillard and Jordan used the test kits to confirm the cocaine quality. Jordan also tasted the cocaine with his tongue. Jordan then took a small amount of the cocaine away with him.

Because of the good "sample," it was decided that Davis would purchase the cocaine in Bowling Green, sell it in Nashville, and split the profit with Dillard and Jordan. Jordan initially offered to provide protection for Davis on the Bowling Green trip. Jordan, however, later appointed Bubba Sivils to go and guarantee Davis's safety, telling Davis that Sivils was "mine and Bill's [Dillard's] man." *Id.* at 190. Jordan later admitted to investigators that he expected a $1,000 payoff for his participation in the Bowling Green deal. Davis was to pay Sivils another $1,500 for Sivils' assistance.

The trip to Bowling Green took place on September 21, 1989. Davis met Jordan on a highway outside town, where Jordan introduced Sivils. Jordan assured Davis that Sivils was "packing," and Sivils indeed displayed a revolver during the Bowling Green drug transaction. Davis and Sivils were then joined by an undercover Kentucky State Police detective, whom Davis introduced as "the man who had the money to buy the cocaine." *Id.* at 216. The three proceeded to the Bowling Green Ramada Inn, the site of the purported drug deal.

They met another undercover agent at the hotel, this one posing as the drug seller. The "seller" produced a one-kilogram package of cocaine. Sivils thrust his knife into the package, withdrew it, and tasted the cocaine from the knife's blade. Sivils confirmed the drug's quality and carried the cocaine to Davis's truck. Davis phoned Dillard upon their return to Hopkinsville, confirming that the deal had gone well and that Davis was on his way to sell the drugs in Nashville.

The next day, September 22, Dillard appeared at a church meeting in Hopkinsville. Ironically, he participated in a panel of law enforcement officials and addressed the topic of drug problems in Christian County.

Meanwhile, that same day, Jordan read a newspaper article that revealed that George Art Davis was an FBI informant in another case. Jordan called Davis to confirm the article's allegation; Davis acknowledged his identity, and the investigation ended.

Federal and state law enforcement officers then immediately executed search warrants at the Christian County Sheriff's Office (anticipating that Dillard and Jordan would later claim as their defense that they were "investigating" Davis) and at Dillard's residence. Agents found $2,590 in a bag stashed in a large shoe closet in Dillard's home. Agents at Dillard's office recovered the diamond ring from Dillard. Agents also obtained eight pages of materials that purported to be an investigation file regarding "G.R. Davis," including a one-page "Supplementary Report," which Dillard claimed to have written on August 15, 1989. *Id.* at 254.

Jordan later told investigators that he "came up with the idea to start an investi-

gation folder" on September 21, the previous day, "so it could be said if necessary that Mr. Davis was being investigated." *Id.* at 272. Jordan said, however, that he had been keeping personal notes on the investigation since the first Memphis trip, August 29 to September 2, 1989. Jordan did admit that he had never seen the supplementary report written by Dillard prior to the evening of September 22.

The defendants were indicted on January 17, 1990 in Louisville, Kentucky. Count one charged that, in August and September of 1989, Dillard, Jordan, and Stokes conspired to convert money of the United States to their own use, in violation of 18 U.S.C. § 641 (1988). Count two charged that these same three men converted the money of the United States, in violation of 18 U.S.C. §§ 641–642 (1988). Count three charged that, in September of 1989, Dillard, Jordan, and Sivils conspired to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1988). Finally, count four charged that Sivils used a firearm in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (1988) (current version at 18 U.S.C.A. § 924(c)(1) (West Supp.1991)).

Count four was severed from the trial of counts one, two, and three. The jury found Sivils guilty of count three, Stokes guilty of count one and not guilty of count two, Dillard guilty of counts one and three and not guilty of count two, and Jordan guilty of count three and not guilty of counts one and two. Sivils was separately convicted on count four.

The district court sentenced Sivils to thirty months on count three and sixty months on count four, with the sentence to be served consecutively. Stokes received a sentence of nine months. Dillard was sentenced to sixty months on count one and 108 months on count three, with the sentence to be served concurrently. Finally, the district court sentenced Jordan to ninety-seven months.

## II

Sivils, Dillard, and Jordan contend that the district court erred in denying their motion for mistrial based on alleged prosecutorial misconduct. A prosecutor's comments in closing argument rise to the level of misconduct and warrant reversal only when the comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)); *accord United States v. Moreno,* 899 F.2d 465, 468 (6th Cir.1990).

During the rebuttal portion of the government's closing argument, the prosecutor made the following statement in reference to Dillard's and Jordan's purported case report:

There's also something else I think you all need to do when you get up to the jury room. You take these yellow sheets of paper and you know when you write on a piece of paper and then underneath this, the sheet underneath this it will leave an impression. I think when you look at these you'll see that they're written—[interrupted by objection from defense attorneys.]

J.A. at 428. The defendants contend that this comment upon the evidence is improper because no testimony indicated that these separate yellow sheets were prepared at the same time.

There was nothing improper in the "experiment" suggested by the prosecutor. Indeed, this court has stated that "we believe jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict." *United States v. Avery,* 717 F.2d 1020, 1026 (6th Cir.1983), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). The impression made by one piece of paper upon another is a matter of everyday experience; the defense suggests no reason why expert testimony should be involved in laying a foundation for this evidence. The foundation was proper in that Jordan's alleged admissions had brought into doubt the authenticity of the documents. Surely, less expertise is involved in this instance than in a jury's

comparison of handwriting samples, yet at least one circuit has held that it is not plain error for the prosecution, in the absence of any evidence at trial, to suggest that the jury compare handwriting. *United States v. Rich*, 580 F.2d 929, 936 (9th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978).

### III

 All defendants contend that the district court erred in its manner of dismissing the alternate jurors. Other circuits do not impose a per se rule of reversal in response to departures from Rule 24(c). *United States v. Phillips*, 664 F.2d 971, 994 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) *and* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). Generally, only such departures as result in prejudice to the defendants warrant reversal. *Id.* at 993; *United States v. Aguon*, 851 F.2d 1158, 1171 (9th Cir.1988) (en banc); *United States v. Levesque*, 681 F.2d 75, 80 (1st Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982); *see also United States v. Viserto*, 596 F.2d 531, 540 (2d Cir.) (finding waiver of strict application of Rule 24(c)), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).[1]

Fourteen jurors were selected at the outset of the proceedings to hear the evidence. The jurors were not initially designated as "regular" or "alternate." Indeed, the first discussion of the matter suggested a consensus that the court would designate and discharge the jurors at the end of trial, by random draw. The defendants raised no objection to the designation method; however, the parties entered no express stipulation agreeing to that method. The court described again, at the end of the trial, the random reduction method to which the parties appeared to have agreed. The court

ultimately employed that method, despite defense counsels' later objection.

Defense counsel contended at the end of trial that Federal Rule of Criminal Procedure 24(c) mandated the discharge of the thirteenth and fourteenth jurors. The thirteenth juror originally appointed to the panel was Sheila Ricks; the fourteenth was Loyd Patton. The jurors actually designated as alternates and discharged at the end of trial were Timothy Fleming (the fourth juror originally appointed) and James McDowell (the third juror).

Rule 24(c) describes the impanelment and discharge of alternate jurors in the following terms:

> Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found unable or disqualified to perform their duties.... An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

Fed.R.Crim.P. 24(c). All four defendants contend that the trial court departed from the language of Rule 24(c) in designating and discharging the alternate jurors by random draw. They fail, however, to demonstrate any prejudice that resulted from the court's chosen procedure.

Defendants cite two cases that appear to deviate from the harmless error standard announced by the courts above. Neither case, however, applies to the facts in the instant appeal. An alternate juror was present during the regular jury's *deliberations* in both *United States v. Virginia Erection Corp.*, 335 F.2d 868, 869 (4th Cir. 1964) and *United States v. Beasley*, 464 F.2d 468, 469 (10th Cir.1972). Those courts held that any such participation violated the privacy and secrecy of the jury's deliberations and required reversal, even if no proof of actual prejudice existed. *Beasley*,

---

1. The Sixth Circuit rejected a per se rule of reversal for departures from Federal Rule of Civil Procedure 47(b), the provisions of which are analogous to those stated in the criminal Rule 24(c). *Hanson v. Parkside Surgery Ctr.*, 872 F.2d 745, 749 (6th Cir.), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

This court applied a harmless error standard of review to violations of civil Rule 47(b). *Id.* The opinion cited the *Levesque* court's "substantial rights" language in its discussion of the harmless error standard adopted for Rule 47(b) departures. *Id.*

464 F.2d at 470; *Virginia Erection,* 335 F.2d at 872–73. Indeed, even the courts that apply a harmless error standard for Rule 24(c) violations have taken care to distinguish situations involving a breach of the jury's sanctity, indicating perhaps a willingness to employ a per se reversal standard under those specific circumstances. *Levesque,* 681 F.2d at 81. *But see United States v. Reed,* 790 F.2d 208, 210 (2d Cir.) (requiring a showing of prejudice even where an alternate participates in the jury's deliberations), *cert. denied,* 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986).

In the present case, however, the alternates *did not participate in the jury's deliberations.* The trial court discharged the alternates, pursuant to the mandate of Rule 24(c), before the jury retired to deliberate the defendants' guilt. Thus, the facts presented by the instant case do not involve the severe compromise of jury secrecy that warranted reversal in the *Beasley* and *Virginia Erection* cases.

Defendants point to nothing in the record indicating that actual prejudice to their case resulted from the trial court's departure from Rule 24(c). Dillard suggests that the thirteenth and fourteenth jurors might have been exposed to greater pretrial publicity, because they were among the last chosen during jury selection. If the later jurors were indeed improperly partial, this prejudice resulted not from the trial court's method, but from the initial appointment of these persons to the fourteen-member jury panel that heard the full case. Regardless, the possibility that Ricks or Patton might be unduly prejudiced against the defendants was minimized by the exhaustive voir dire of Ricks and Patton regarding pretrial publicity.

In the final analysis, defendants offer nothing more than speculative scenarios in which the trial court's designation of alternates could have resulted in prejudice, such as the possible exclusion of the only African–American juror. These scenarios do illustrate the reasons for strict adherence to Rule 24(c); accordingly, we join the other circuits in encouraging strict adherence.

Nonetheless, although the district court erred by not dismissing the jurors according to the order in which they were called, we find the error to be harmless on the facts of this case.

## IV

■■■ Sivils and Stokes contend that the district court erred in refusing to sever certain counts from other counts. The denial of a motion for severance must stand absent a showing that the trial court abused its discretion. *See, e.g., United States v. Hughes,* 895 F.2d 1135, 1144 (6th Cir.1990). Defendants bear a heavy burden of showing that specific and compelling prejudice resulted from the joint trial and that such prejudice could have been rectified only by separate trials. *United States v. Davis,* 809 F.2d 1194, 1207 (6th Cir.), *cert. denied,* 483 U.S. 1007, 1008, 107 S.Ct. 3234, 3235, 97 L.Ed.2d 740 (1987). Such a showing of prejudice requires the defendants to demonstrate that the jury was unable to separate and treat distinctively evidence relevant to each particular defendant. *United States v. Swift,* 809 F.2d 320, 322 (6th Cir.1987). Moreover, even if the defendants establish some potential jury confusion, such confusion must be balanced against society's need for speedy and efficient trials. *Id.*

■■■ Sivils and Stokes point to nothing in the record indicating that the jury failed to distinguish between evidence implicating them and other evidence relating to codefendants. Their claims of prejudice are further undermined by the trial court's cautionary instructions, given both during and after trial, which advised the jury to give separate consideration to each defendant. Where jurors are so instructed, courts presume that the jurors understood and followed the directions given. *United States v. Zalman,* 870 F.2d 1047, 1053 (6th Cir.), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989). Furthermore, as we noted in *United States v. Gallo,* 763 F.2d 1504 (6th Cir.1985), *cert. denied,* 474 U.S. 1068, 1069, 106 S.Ct. 826, 828, 88 L.Ed.2d 798, 800 (1986) *and* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986), the

simple fact that "the jury was able to acquit each appellant on some counts and convict them on others" strongly suggests "that the jury was not confused by the testimony adduced at trial, and was able to attribute to each appellant evidence pertinent to that particular party." *Id.* at 1526.

The mere facts that Sivils did not participate in the crimes charged in counts one and two and that Stokes did not participate in the conspiracy charged in count three do not alone compel severance. Society's interest in efficient trials is echoed by the general rule that holds that persons jointly indicted in conspiracies should be tried together, because the evidence as to each defendant tends to be the same. *United States v. Scaife,* 749 F.2d 338, 345 (6th Cir.1984). That policy applies even where certain charges concern individual conspirators only. *See id.*

It is true, as we discussed in *Gallo,* that the existence of "guilty transference" may turn on " 'whether the number of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled.' " 763 F.2d at 1526 (quoting *United States v. Toliver,* 541 F.2d 958, 963 (2d Cir.1976)). The *Gallo* court held, however, that the trial of five defendants and two conspiracies did not create such a spillover. *Id.* In the present case, the four defendants and two conspiracies do not present such vast complexity as to warrant severance.

Both Sivils and Stokes point to evidence, adduced against the others, that is allegedly so inflammatory as to mandate severance. The general rule is, however, that " '[m]erely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, prove substantial prejudice in the latter's trial.' " *Zalman,* 870 F.2d at 1053 (quoting *Gallo,* 763 F.2d at 1525).

## V

Stokes contends that the district court erred in not entering judgment of acquittal on his behalf in regard to conspiracy count one. In that his claims assert legal error, rather than error based upon sufficiency of the evidence, the standard of review is de novo.

Stokes argues first that a judgment of acquittal is proper because he cannot be convicted of conspiracy after he was acquitted of the substantive count. It is settled law, however, that "a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy." *United States v. Rabinowich,* 238 U.S. 78, 85, 35 S.Ct. 682, 683, 59 L.Ed. 1211 (1915). The jury could have concluded that Stokes conspired to obtain the $12,000, but that his scheme ultimately failed.

Stokes argues also that he is entitled to judgment of acquittal because the prosecution failed to prove that his conspiracy encompassed an "anti-federal intent." Court are unanimous that a person may violate 18 U.S.C. § 641 (1988) (theft of government property) even though that person is ignorant of the government's ownership of the converted property. As stated by the District of Columbia Circuit, "[i]t is now well established that the statutory requirement that the stolen property belonging to the government merely furnishes the basis for federal jurisdiction and that defendant's knowledge of this jurisdictional fact is irrelevant." *United States v. Baker,* 693 F.2d 183, 186 (D.C.Cir.1982). The intent element required by § 641 is the criminal intent to steal, and not the intent to steal property known to be the government's property. *United States v. Smith,* 489 F.2d 1330, 1332 (7th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974). Nothing in the language of the statute or in its legislative history suggests that Congress intended knowledge of government ownership to be an element of a § 641 violation. *United States v. Howey,* 427 F.2d 1017, 1018 (9th Cir.1970). Indeed, the only court ever to require proof of knowledge of government ownership, the Tenth Circuit, expressly

overruled its own precedent in a subsequent case, adopting the prevailing view that government ownership is necessary only to establish federal jurisdiction. *United States v. Speir*, 564 F.2d 934, 938 (10th Cir.1977) (en banc), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1495, 55 L.Ed.2d 521 (1978).

 Nevertheless, Stokes insists that, even though knowledge of government ownership need not be proved to sustain a conviction for the substantive conversion offense, such knowledge must be proved to support a conviction for conspiracy to commit that offense. At one time, the Sixth Circuit appeared to impose the additional requirement of "antifederal intent" to sustain conspiracy convictions under 18 U.S.C. § 371. *United States v. Zimmerman*, 506 F.2d 752, 754 (6th Cir.1974). The Supreme Court repudiated the antifederal intent doctrine, however, in *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). The Sixth Circuit adopted the *Feola* doctrine in 1976 with its decision in *United States v. Leon*, 534 F.2d 667, 674 (6th Cir.1976).

### VI

 Dillard contends that the district court erred in adding two levels, for purposes of sentencing, for the possession of a firearm. We review a district court's factual findings in connection with sentencing under a "clearly erroneous" standard, *United States v. Luster*, 889 F.2d 1523, 1525 (6th Cir.1989), giving "due deference" to the sentencing court's application of the guidelines to the facts. 18 U.S.C. § 3742(e) (1988). The application of the guidelines to an undisputed set of facts is, however, reviewed de novo. *See, e.g., United States v. Wilson*, 920 F.2d 1290, 1294 (6th Cir. 1990).

 The sentencing guidelines provide that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." United States Sentencing Commission, *Guidelines Manual* § 2D1.1(b)(1) (Nov.1991) [hereinafter U.S.S.G.]. The commission explains that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that

the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." *Id.* § 2D1.1, comment. (n. 3).

Dillard argues that his case provides another example of when "it is clearly improbable that the weapon was connected with the offense." He points out that he carried his firearm as part of his status as a sheriff. This does not mean, however, that the weapon could not be connected with the offense. The First Circuit has explained the connection as follows:

> Here, the weapon was closely linked to the very powers and office which appellant used to implement his felonious activities. The knowledge that Ruiz carried a gun quite probably instilled confidence in those who relied upon him for protection in exchange for drugs, and fear in those who dealt with his suppliers. The fact that Ruiz was compelled to carry the gun by virtue of his employment was, of course, to be considered— but that fact alone did not make it "clearly improbable" that the weapon was connected with the drug offenses.

*United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir.1990). Thus, we cannot find that the district court's conclusion that Dillard possessed the weapon in connection with the offense was clearly erroneous.

### VII

 Jordan contends that the district court committed reversible error in referring to count four of the indictment during voir dire. He argues that the references to count four, although not intentionally made, were inherently prejudicial because "[s]uch information presented the majority of the jury with essentially 'evidence of another offense upon which the defendants were not being tried,' and may have led to the contamination of the other three members of the jury." Br. of Jordan at 9. The standard of review of a trial judge's conduct of a voir dire examination is whether the defendant can demonstrate manifest error. *See United States v.*

*Blanton,* 719 F.2d 815, 829–30 (6th Cir. 1983) (en banc), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984).

Jordan moved the trial court to disqualify the jury panel due to the trial court's brief and inadvertent mention, during voir dire, of a "fourth count" in the indictment. The court's first mention of the fourth count in the indictment stated, in its entirety, that "[i]t will not be necessary to discuss the allegations of Count 4 at this time." J.A. at 118. The court's second and last reference stated, in full, that "[n]ow the fourth count of the indictment— [objection by defense, sustained.]" J.A. at 122. The court overruled Jordan's motion finding that no substantial error accrued from the harmless "slip of the tongue." *Id.* at 131–32. Jordan has demonstrated no prejudice from this brief reference made in a trial that lasted several weeks and the reference constituted harmless error.

### VIII

■ Jordan contends next that the district court erred in admitting evidence in the form of audio and video recordings. The crux of the government's case against Jordan and the other defendants consisted of thirty-two audio, video, and audio-video tape recordings, which were introduced via the testimony of the FBI's paid informant, George Davis. "[T]he admission of tape recordings at trial rests within the sound discretion of the trial court." *United States v. Robinson,* 707 F.2d 872, 876 (6th Cir.1983).

Specifically, Jordan contends that the district court judge erred in admitting the evidence without first establishing the elements of a proper foundation as delineated in *United States v. Starks,* 515 F.2d 112, 121 n. 11 (3rd Cir.1975).

*Starks* is not, however, the standard of the Sixth Circuit. Here,

> [i]t is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court. That discretion presumes, as a prerequisite to admission, that the tapes be authentic, accurate and trustworthy. Moreover, they must be audible and sufficiently

comprehensible for the jury to consider the contents.

*Robinson,* 707 F.2d at 876 (citations omitted). In the present case, the undercover witness, George Davis, occupied an electronics shop in which the FBI installed recording and videotaping equipment. Davis testified that the equipment was routinely checked to make sure it was working properly. He also testified about his procedures for handling the tapes: after recording them, he initialed the tapes and turned them over to FBI Agent Seldon Sledd or Kentucky State Police Detective Richard Barton. Agent Sledd testified about the chain of custody regarding the tapes. Detective Baron testified that he periodically checked the recording and videotaping equipment. On this record, we do not find that the district court abused its discretion in finding an adequate foundation for admission of the video and audio tapes.

■ Jordan argues also that the district court erred in admitting his oral statements made to law enforcement officers. Specifically, Jordan alleges violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court has explained that,

> [a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. In the present case, the "totality of circumstances" on which the court focused primarily were that the interview took place in a station house, and that Beheler was a suspect because he had spoken to police earlier. But we have explicitly recognized that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."

*California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathia-*

*son*, 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977)).

Jordan spoke with investigators on September 22, 1989 and again the next day on September 23. Evidence adduced at trial showed that the agent interviewing Jordan on September 22 informed Jordan before the questioning began that Jordan was not then under arrest nor would he be arrested at the conclusion of the interview. No physical restraint or compulsion was employed. Agents did not read Jordan the *Miranda* warnings, noting at trial that officers perform that task only when actually arresting a suspect. Jordan himself testified during the suppression hearing that, given his ten-year career as a police officer, he was familiar with his right to remain silent and with his right to an attorney.

Jordan remained comfortable and at liberty to eat, move about, and make phone calls during the September 22 interview. Jordan asked and was allowed to speak privately with one of the agents present. Jordan made several phone calls during the interview. Jordan also asked for and received two soft drinks, and was freely permitted to use the rest room.

Jordan himself initiated the September 23, 1989 interview by calling one of the investigating agents and asking for a second meeting. Jordan agreed to participation of a second agent in the interview. Jordan and the two officers spoke together in the lot of a country church, conversing informally in the car of one of the agents. On these facts, *Beheler* simply leaves no room for doubt that, because Jordan's statements were voluntary and he was not in custody, the trial properly denied Jordan's motion to suppress.

## IX

■■ Jordan contends next that the district court erred in determining the quantity of cocaine involved in the conspiracy for purposes of sentencing. The problem arises because Jordan negotiated for a specific dollar amount, $15,000, rather than a specific quantity of cocaine. As revealed by a tape-recorded telephone conversation between Davis and Jordan, Davis was un-

sure about the quantity of cocaine that he could purchase for $15,000. In response to Jordan's question whether "[a] pound and a tenth is what you're supposed to get for fifteen," Br. of Jordan app. at 5, Davis replied, "[t]hat's ... according to what Jerry [Stokes] told me, see that's about right," *id.* A pound and a tenth is equal to 498.96 grams, for which the sentencing guidelines prescribe a base offense level of twenty-four. U.S.S.G. § 2D1.1(c)(10).

Nonetheless, the state police and FBI decided to "sell" one kilogram of cocaine to Davis for $15,000. The sentencing guidelines prescribe a base offense level of twenty-six if the offense involves at least 500 grams, but less than two kilograms, of cocaine. *Id.* § 2D1.1(c)(9) Thus, Jordan correctly notes that the government's decision as to the amount of cocaine directly affected the sentence imposed.

There is indeed something very disturbing about the government having the power to manipulate a sentence by essentially changing the market value of the cocaine. The government contends that we should review this case the same as any other. For example, in *United States v. Moreno*, 899 F.2d 465 (6th Cir.1990), we held that "the sentencing judge ... has the prerogative to make a determination of the quantity of drugs involved in the scheme and to sentence accordingly." *Id.* at 473. *But see United States v. Rigsby*, 943 F.2d 631, 640, 643 (6th Cir.1991) (disagreeing with, but following, *Moreno* ), *cert. denied,* — U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992). This case is not, however, in the same category as *Moreno*.

We choose, instead, to view Jordan's claim as one that strikes at the heart of fundamental fairness. As the Third Circuit noted in *United States v. Twigg*, 588 F.2d 373 (1978), "the nature and extent of police involvement" in a crime may be "so overreaching as to bar prosecution of the defendants as a matter of due process of law." *Id.* at 377. If Jordan could demonstrate that the government manipulated the dollar amount of cocaine to increase his sentence, such manipulation would certainly provide

a fundamental fairness defense against the higher sentence.[2]

The record reveals, however, that Jordan ratified the amount of cocaine actually sold to the defendants. In his conversation with Davis on September 21, 1989, Davis reported the exact quantity that he had been able to purchase: "[e]verything went better than I expected it to, too. I got a little bit more. *I got a whole kilo.*" Br. of Jordan app. at 11. Jordan's response reflected no surprise at the quantity Davis had obtained; he simply said "[u]m-hm." *Id.* Accordingly, Jordan fails to demonstrate that the amount of cocaine that he received in exchange for $15,000 was so unreasonable as to make his sentence fundamentally unfair.

## X

Jordan contends finally that the district court erred in applying both U.S.S.G. § 2D1.1(b)(1) (possession of a firearm) and § 3B1.3 (abuse of a position of public trust). He reasons that this constitutes double punishment because his position of public trust inherently involves possessing a firearm. The issue of the possession of a firearm by a law enforcement official was addressed in part VI, *supra.* The enhancement based on abuse of a position of public trust, however, is not related to Jordan's carrying of a firearm. Accordingly, Jordan's contention is wholly without merit; the district court acted properly in applying both sections, for the simple reason that both sections applied.

## XI

For the foregoing reasons, the defendants' convictions and sentences are AFFIRMED in all respects.

---

**2.** In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (plurality), a majority of the Supreme Court was unable to agree whether predisposition should operate as a bar to the fundamental fairness defense as well as to the conventional entrapment defense. Because we find that Jordan ratified the amount chosen, we do not reach the issue of predisposition.