## III

■ The United States moves to exclude any evidence at trial regarding an internal FBI operations manual that Smith obtained through discovery. Smith wants to introduce the manual to prove that the FBI agents failed to follow its guidelines, but Smith fails to explain the relevance of that proof at trial. Such internal agency guidelines do not confer rights on any party. *See, e.g., United States v. Craveiro,* 907 F.2d 260, 263–64 (1st Cir.), *cert. denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990). The law of entrapment governs this case, and whether FBI agents complied with internal guidelines is not relevant.

## IV

UNITED STATES of America, Plaintiff,

v.

**Thomas Anthony SMITH, Defendant.**

Crim. A. No. 92–38.

United States District Court,
E.D. Kentucky,
at London.

March 19, 1993.

Robert F. Trevey, David P. Grise, Asst. U.S. Attys., Lexington, KY, for U.S.

William E. Johnson, Anita M. Britton, Stoll, Keenon & Park, Frankfort, KY, for Smith.

## OPINION AND ORDER

FORESTER, District Judge.

This matter is before the Court upon the motion in limine of the defendant, Thomas Anthony Smith, to exclude statements that he made to FBI agents on June 11, 1991. Smith contends that his statements are inadmissible because the agents failed to inform him of his rights and because the agents coerced the statements by making promises of leniency.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the fifth amendment privilege against self-incrimination prevents the government from using any statement against a defendant obtained through "custodial interrogation" unless the government informs him of his rights. The rights of the *"Miranda* warnings" include the right "to remain silent, to consult with an attorney, and to have an attorney appointed for him if he could not afford one." *Berkemer v. McCarty*, 468 U.S. 420, 424, 104 S.Ct. 3138, 3142, 82 L.Ed.2d 317 (1984). "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *California v. Beheler*, 463 U.S. 1121, 1123, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983) (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612).

Although the nature of any police questioning necessarily contains coercive aspects, "[t]he police are required to give *Miranda* warnings only 'where there has been such a restriction on a person's freedom as to render him 'in custody.' '" *Id.* at 1124, 103 S.Ct. at 3519 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). Examining the "totality of circumstances," "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree asso-

ciated with a formal arrest." *Id.* at 1125, 103 S.Ct. at 3520 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714). "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151.

Applying these precedents, the Sixth Circuit Court of Appeals explained that "[t]he test is objective: would a reasonable man in the defendant's position, knowing the facts as the defendant knew them, have felt that he was under arrest or was 'otherwise deprived of his freedom of action in any significant way.' " *Cobb v. Perini*, 832 F.2d 342, 346 (6th Cir.1987) (quoting *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151), *cert. denied*, 486 U.S. 1024, 108 S.Ct. 1998, 100 L.Ed.2d 230 (1988). An undisputed fact is that Smith was never placed under arrest on June 11, 1991. Therefore, this Court must examine all the circumstances to determine if a reasonable person in Smith's position would have believed that he was deprived of his freedom of movement of the degree associated with a formal arrest. *See Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151; *Beheler*, 463 U.S. at 1124, 103 S.Ct. at 3519.

On February 8, 1993, the Court conducted a hearing on Smith's motion to dismiss the indictment. FBI Agent James Huggins testified at the hearing about the circumstances surrounding Smith's statements on June 11, 1991. Huggins testified that he, Agent John Parrish, and Agent Andrew Sluss had Smith under video and audio surveillance when Smith was in a recreational vehicle with Teresa Brown in Barbourville, Kentucky on June 11, 1991. Transcript of February 8, 1993 hearing ("Tr.") at 110. Under questioning by Smith's counsel, Huggins agreed that he told Smith after the agents entered the vehicle that they were FBI agents, that the money Smith received was FBI money, that Smith was under investigation for taking bribes, that Smith had a real problem, and that Smith was in a lot of trouble. Tr. at 110–111, 119, 145. Huggins then told Smith that Agent Sluss would tell Smith what he

could do to help himself. Tr. at 111, 119. Huggins testified that Sluss explained the charge against Smith. Tr. at 112. The agents did not place Smith under arrest, and they did not give *Miranda* warnings to Smith. Tr. at 119, 112. Huggins said that, although Smith was free to leave, he did not recall telling Smith that Smith could leave. Tr. at 112. Agent Huggins testified that Smith was "extremely upset and shocked." Tr. at 145. Huggins further testified that, during the discussions in the vehicle, Smith did not immediately agree to cooperate with the FBI. Tr. at 146. Rather, Smith asked to speak to someone from the United States Attorney's Office. Tr. at 115, 146. Huggins testified that he did not threaten Smith. Tr. at 146. Huggins said that he contacted Assistant United States Attorney Robert Trevey to set up a meeting on the following day, June 12, 1991. Tr. at 116, 146.

Agent John Parrish testified that the agents entered the motor home vehicle together on June 11, 1991. Tr. at 59. Parrish said that they did not place Smith under arrest. Tr. at 60. He also said that Smith requested a meeting with someone from the United States Attorney's Office. Tr. at 56, 60. Parrish testified that Agent Sluss told Smith that the agents would give Smith an opportunity to cooperate. Tr. at 58. Parrish stated that Smith agreed, during a meeting on June 12, 1991, to cooperate with the FBI. Tr. at 68.

Agent Andrew Sluss testified that, after he and the other agents entered the vehicle on June 11, 1991, he told Smith what they knew about Smith's activities and asked Smith to cooperate with the FBI. Tr. at 159. Sluss said that the agents did not charge Smith. Tr. at 160. He testified that, during the discussions in the motor home on June 11, 1991, the agents set up a meeting for the following day because Smith wanted to speak to a representative of the United States Attorney's Office. Tr. at 167–168. Sluss said that Smith indicated a willingness to cooperate on June 11 but that Smith wanted to speak to someone from the United States Attorney's Office about his cooperation. Tr. at 168. Sluss further testified that, at the end of the conversations on June 11, Smith thanked the agents "for giving him this opportunity to straighten things out." Tr. at 188–189.

Smith testified that, on June 11, 1991, he went into a van with Teresa Brown and Clifford Brown. The van was in a parking lot outside Smith's jewelry store in Barbourville. Tr. at 191–192. Smith said that the agents then came into the van and talked to him for fifteen or twenty minutes. Tr. at 192–193. Smith testified that Agent Huggins said that they had not charged Smith and that, if Smith would cooperate, Huggins would recommend no charge against Smith. Tr. at 193–194, 230, 232. Smith further testified that Sluss asked questions and that Huggins "insinuated two or three times that I was in a lot of trouble but I could help myself if I would cooperate." Tr. at 194. Smith said that he requested a meeting with the people from the United States Attorney's Office after Huggins told him that they would determine what to do with Smith. Tr. at 194, 230. Smith testified that the agents did not inform him of his rights. Tr. at 196.

On March 18, 1993, with the consent of William Johnson, counsel for Smith, and David Grise, counsel for the United States, the Court examined *in camera* a videotape of the events of June 11, 1991. Smith was sitting on a couch in a motor home vehicle talking with Teresa Brown and Clifford Brown. FBI agents had placed a hidden camera inside the vehicle. After Teresa Brown left the vehicle, the FBI agents entered the vehicle together. Clifford Brown then departed. Upon their entry, the agents did not brandish any guns, make any physical contact with Smith, or communicate any threats or demands. Agent Huggins said, "My name is Jim Huggins. I'm with the FBI. We'd like to talk to you." Huggins then stated that he had a search warrant for Smith's person and that he "would like to have the 7500 dollars back that you just took." Smith stood up, reached into his back pocket, and gave Huggins the money. Huggins said, "That's FBI money. That's why we are taking it." Huggins then showed Smith the search warrant and told him to "have a seat." At that point, with all the persons sitting, Huggins introduced himself,

Agent Sluss, and Agent Parrish. Huggins next said that Smith had been under investigation for several months, that they knew that Smith had taken bribes, and that they had tapes. Huggins concluded by telling Smith that Smith had "a real problem" and that Agent Sluss would tell Smith what Smith could do to help himself. Agent Sluss then reiterated that Smith had "real problems." At that point, the surveillance recording was terminated.

In arguing that the Court should suppress his statements of June 11, 1991, Smith relies on *United States v. Mahar*, 801 F.2d 1477 (6th Cir.1986). In *Mahar*, approximately twenty federal agents and local police officers conducted a search of a clinic of which the defendant, Riley Mahar, was the manager of the clinic's pharmacy. *Id.* at 1480, 1499. The court of appeals described the events leading up to the defendant's interrogation:

Riley Mahar, in the pharmacy at the time of the officers' arrival at the Clinic, heard a "loud pounding." Pushing open the pharmacy door, he was met with a gun aimed at him by one of the agents. He and other employees were informed "This is the FBI" and were directed to raise their hands and place them against the wall of the waiting room. When he uttered a statement to the person next to him, he was swatted on the head with a "hard" object and told to "shut up."

Riley estimated his hands were raised against the wall for about twenty minutes. During this time he was patted down, as were other employees. Once he was permitted to drop his hands, it was another ten to twenty minutes before he was taken to the corner of the waiting room for identification and photographing.

After his identification, Riley, as the pharmacist, was then taken to the pharmacy and asked to open the safe. For the next 10 minutes he remained in the pharmacy with three agents, and was unable to move about. Next, one of the agents escorted Riley to a doctor's examining room for an interview with agent Diane Bennett. She informed Riley that she was taking a statement pursuant to the search warrant. He was told neither that he had the right

to consult a lawyer, that he need not submit to the interview, nor that he was free to leave the Clinic.

The door to the interview room was ajar throughout the interview, and agents were standing just outside the door. The interview was completed in less than half an hour. At its conclusion, Riley was taken by one of the agents back to the pharmacy.

*Id.* at 1499–1500.

Based on these facts, the court held that Riley Mahar's statement was inadmissible:

In light of all the circumstances surrounding his detention, we find that a "reasonable person" in Riley's position would not have felt free to leave the Clinic prior to or during his interview. As seen, prior to being interviewed by agent Bennett, Riley was detained by armed agents first in the Clinic waiting room, and then in the pharmacy. At no point was he advised that he could leave the Clinic. Under all the circumstances, as described above, we thus conclude that at the time he was interviewed by Riley Mahar was "in custody" under *Miranda*.

*Id.* at 1500 (footnote omitted). Smith contends that the circumstances of June 11, 1991 are similar to the events in *Mahar* because he states that the FBI agents surrounded him in tight quarters. He argues that no reasonable person could have concluded that he had the right to depart.

The United States argues that the circumstances of June 11, 1991 are more analogous to the facts in *United States v. Sivils*, 960 F.2d 587 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). In *Sivils*, an agent informed the defendant before questioning that the defendant "was not then under arrest nor would he be arrested at the conclusion of the interview." Furthermore, "[n]o physical restraint or compulsion was employed." The court explained that the agents permitted the defendant to make several phone calls and to use the rest room. *Id.* at 598.

After a careful review of the legal authorities, the transcript of the February 8, 1993 hearing, and the videotape of the events of June 11, 1991, this Court must conclude

based on the totality of circumstances that a reasonable person in Smith's position would not have believed that he was deprived of his freedom of movement of the degree associated with a formal arrest. *See Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151; *Beheler,* 463 U.S. at 1124, 103 S.Ct. at 3519. Although the FBI agents entered the van together, requested a return of the money, exhibited a search warrant, told Smith that he had a real problem, and sought his cooperation, those facts alone would not lead a reasonable person to feel that he had been deprived of his freedom of movement to the degree associated with a formal arrest. The agents' entry into the van was calm and nonthreatening. Smith admitted during the hearing that the entire interview with the agents lasted only fifteen or twenty minutes. Tr. at 192–193. In seeking Smith's cooperation, the agents told Smith that they were not charging Smith. Tr. at 160, 193–194, 230, 232. The circumstances of the June 11, 1991 interview certainly do not approach the severity of the events that took place in *Mahar.* In that case, the court emphasized that the agents displayed a gun, required the defendant to raise his hands for twenty minutes, hit him, told him to "shut up," patted him down, moved him for identification, took him to a room for questioning, and told him that they were seeking a statement pursuant to a search warrant. *See* 801 F.2d at 1499–1500. Moreover, as the court found in *Sivils,* this Court finds that the agents did not employ physical restraint or compulsion. *See* 960 F.2d at 587. Therefore, considering all circumstances, this Court holds that the agents' failure to give *Miranda* warnings does not require suppressing Smith's statements of June 11, 1991.

Smith also argues that his statements of June 11, 1991 are inadmissible because he contends that the FBI agents coerced the statements by making promises of leniency. In *McCall v. Dutton,* 863 F.2d 454 (6th Cir. 1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989), the court of appeals explained that, in determining if a defendant's confession was involuntary in violation of due process, a court must decide three issues: whether the police extorted the confession by coercive activity; whether the

coercion was sufficient to overbear the defendant's will; and whether the coercive activity in fact overbore the defendant's will. *Id.* at 459; *see Griffin v. Strong,* 983 F.2d 1540, 1542 (10th Cir.1993) (confession must be made freely and voluntarily and must not be extracted by threats, compulsion, or inducement); *cf. Illinois v. Perkins,* 496 U.S. 292, 301, 110 S.Ct. 2394, 2399–2400, 110 L.Ed.2d 243 (1990) (Brennan, J., concurring) (due process violation when police practice deception and manipulation to obtain confession).

This Court finds that no evidence exists that the FBI agents coerced a confession from Smith or that they used deception or manipulation that violates due process. At the conclusion of the hearing of February 8, 1993, the Court found that Smith had not established by a preponderance of the evidence that an agreement not to prosecute existed. Tr. at 252. The Court found that the FBI agents told Smith that he would be prosecuted but that the government would make an appropriate motion if Smith rendered substantial assistance. Tr. at 253. Moreover, the Court now finds that, although the agents sought Smith's cooperation, they made no promises of leniency and asserted no threats. Rather, they offered to make a recommendation to representatives of the United States Attorney's Office. The Court finds that the agents did not engage in any coercive activity.

Accordingly, the Court, being well and sufficiently advised, hereby ORDERS that Smith's motion in limine to exclude statements that he made to FBI agents on June 11, 1991 is DENIED.