9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raymond H. CURTSINGER (92-6044) and Pete Gilbert (92-6067),
Defendants-Appellants.
 Nos. 92-6044, 92-6067.
 United States Court of Appeals, Sixth Circuit.
 Oct. 20, 1993.
 
 Before: MILBURN and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Raymond Hollis Curtsinger ("Curtsinger") and Pete Gilbert ("Gilbert") appeal their jury convictions, and the sentences imposed thereon, of one count of robbing a bank with a dangerous weapon in violation of 18 U.S.C. Sec. 371; one count of armed bank robbery in violation of 18 U.S.C. Sec. 2113(a) & (d); two counts of carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. Sec. 924(c)(1); one count of being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1) and Sec. 924; one count of possession of an unregistered firearm in violation of 26 U.S.C. Secs. 5861(d), 5871; and one count of receiving, concealing and disposing of a stolen firearm which travelled in interstate commerce in violation of 18 U.S.C. Sec. 922(j) and Sec. 924.
 
 
 2
 On appeal, the issues are (1) whether the district court erred in denying Gilbert's motion to dismiss, or alternatively to elect prosecution, as to counts two, three, four, five, nine, and ten of the indictment and properly imposed sentence pursuant to 18 U.S.C. Sec. 924(c); (2) whether the district court abused its discretion under Federal Rule of Criminal Procedure 14 by denying Curtsinger's motion to sever count seven of the indictment, which charges a violation of 18 U.S.C. Sec. 922(g); (3) whether the district court erred in permitting the in-court identification of Gilbert by witness Mary Wood; (4) whether the district court abused its discretion by permitting evidence of Curtsinger's threat to harm government witnesses; (5) whether the district court abused its discretion in limiting the cross-examination of government witnesses who had exercised their Fifth Amendment rights concerning uncharged acts of misconduct by prohibiting introduction of extrinsic evidence of those acts; (6) whether the district court abused its discretion by refusing to permit Curtsinger to introduce a portion of the videotaped deposition of witness Gary Odom into evidence; (7) whether the district court erred in denying Gilbert's motions for judgment of acquittal under Fed.R.Crim.P. 29 as to counts nine and ten of the indictment and in denying Curtsinger's Rule 29 motion for judgment of acquittal as to all of the counts against him; (8) whether the district court erred in denying Curtsinger's motion for a mistrial based upon the prosecutor's closing argument; (9) whether the district court erred in rejecting Curtsinger's request for an addict witness instruction; (10) whether the district court erred in denying Curtsinger's motion for a new trial; (11) whether the district court correctly sentenced Gilbert as an armed career criminal under 18 U.S.C. Sec. 924(e); and (12) whether the district court correctly calculated Gilbert's and Curtsinger's offense level under United States Sentencing Guidelines ("U.S.S.G.") Sec. 2B3.1(b)(B) by including the value of a stolen pickup truck used in the bank robbery. For the reasons that follow, we affirm the defendants' convictions. However, because we conclude that the district court erred in including the value of the stolen S-10 pickup in calculating Gilbert's and Curtsinger's offense level, we vacate the sentences imposed by the district court and remand for resentencing.
 
 I.
 A.
 
 3
 During the summer of 1991, seventeen year old Joel Jaggers met Gary Odom, a felon with multiple convictions in Atlanta, Georgia. In September 1991, Odom and Jaggers travelled to Lexington, Kentucky, where they met Gilbert, also a convicted felon. Gilbert introduced Odom and Jaggers to Curtsinger. Subsequently, Odom and Jaggers returned to Atlanta. However, in October 1991, Odom and Jaggers, accompanied by Jaggers' girlfriend, Ginger Smith, left Atlanta to return to Lexington to meet Gilbert. En route, Jaggers' car broke down in Chattanooga, Tennessee. Odom stole a state highway truck, which the trio used to travel to Knoxville, Tennessee. At Knoxville, Odom and Jaggers stole a 1991 blue Chevrolet S-10 pickup from Jenkins Floor Coverings, which the trio used to travel to Gilbert's residence in Lexington.
 
 
 4
 After several days, Odom arranged with Curtsinger to rent a trailer home for the trio at 565 Paper Mill Road in Garrard County, Kentucky. The trailer home was owned by the Curtsinger family. Subsequently, Odom learned from Gilbert that Curtsinger had money problems. Consequently, Odom, Curtsinger, Jaggers and Gilbert began to plan a bank robbery.
 
 
 5
 In preparation for the bank robbery, Odom asked Curtsinger about acquiring guns. A few days later, Curtsinger told Odom and Jaggers that he knew of a house in Versailles, Kentucky, which had guns in it. Jaggers testified that Curtsinger said that his son-in-law, or nephew, or somebody knew the homeowner. Curtsinger took Odom and Jaggers to Pablo Ramirez's home at 313 Ridgewood, Versailles, Kentucky, showed them the house, and told them where the firearms were located in the house. Curtsinger discussed the plans to steal the firearms with the other conspirators. The following day, November 4, 1991, Odom drove the stolen S-10 pickup to Ramirez's home, determined that no one was at home, gained entry to the house through an unlocked window, and found the guns in the back bedroom of the house, just as described by Curtsinger. Jaggers crawled through an unlocked window and placed two .12 gauge shotguns, a .20 gauge shotgun, a .22 caliber rifle, a .30-.30 caliber rifle, a .22 caliber pistol, and a BB pistol into a bedspread along with some ammunition and handed them out the window to Odom.
 
 
 6
 Odom and Jaggers initially took the firearms to Gilbert's house in Lexington. Gilbert was aware that the guns were to be brought to his house, and the plans for the bank robbery were again discussed. Eventually, the stolen firearms were taken from Gilbert's residence to 565 Paper Mill Road. Curtsinger agreed to sell one of the .12 gauge shotguns and the .20 gauge shotgun in order to raise money. Odom gave the .30-.30 caliber rifle to either Gilbert or Curtsinger as a gift. Subsequently, during their discussions, the conspirators agreed that the other .12 gauge shotgun would be converted into a sawed-off shotgun and carried by Odom during the bank robbery. Gilbert was to carry the .22 caliber pistol and Jaggers was to carry the BB pistol.
 
 
 7
 The conspirators continued to discuss their plan to rob a bank. Gilbert, who was familiar with the area, took Odom and Jaggers to the Farmers Bank of Nicholasville, Kentucky, and pointed it out as a possible target of the plan. The conspirators decided that Odom would enter the bank carrying the sawed-off shotgun and would force all but one of the tellers in the bank to lie down on the floor; Gilbert would carry the .22 caliber pistol and would make sure that all of the employees in the back offices of the bank were brought out to the front of the bank and made to lie on the floor with the tellers. Jaggers was to carry the BB pistol and collect the money from the tellers. The conspirators further planned to go to the bank in the stolen S-10 pickup and to drive the pickup to a "switch" site, a little over a mile from the bank, where Curtsinger would be waiting in his truck to pick up the three robbers and drive them away.
 
 
 8
 A few days prior to the robbery, Odom, Gilbert, and Jaggers drove to the Farmers Bank of Nicholasville. Jaggers went inside to look at the floor plan of the bank and to check for security guards. There were no guards and Jaggers observed that only three female tellers worked there. He also observed that the bank's surveillance cameras were connected to a videotape machine located near the vault. Thereafter, the parties agreed that Gilbert would take the videotape from the machine during the holdup.
 
 
 9
 On the morning of November 19, 1991, the four conspirators met in Lexington and travelled to the "switch" site in the stolen S-10 pickup. There they found that the "switch" site had been fenced in during the night and they had to search for a new site. A new "switch" site was located behind a home which was under construction. Gilbert, Odom, and Jaggers then drove to the Farmers Bank in the stolen S-10 pickup. They were each carrying the weapons that they had previously planned to carry.
 
 
 10
 At approximately 1:10 p.m., tellers Jane Heibenthal and Ann Beckwith were working behind the teller counter of the bank. Teller Mary Wood was eating her lunch in the kitchen at the rear of the bank. At that time, Gilbert, Odom, and Jaggers entered the bank with their weapons drawn. They were not wearing masks. Odom ordered Heibenthal onto the floor; Gilbert went to the rear of the bank and brought Wood to the front of the bank at gunpoint. Wood noted that Gilbert had slicked back dark hair, a goatee, ruddy complexion, very mean-looking eyes, was about 5'7" to 5'8", and weighed approximately 175 pounds. Both Wood and Heibenthal identified Gilbert at trial.
 
 
 11
 Jaggers went to Beckwith's teller station and demanded money from her. He also told her that if she gave him any dye packs he would shoot the other two tellers. The bank's videotape then showed Gilbert approaching the videotape machine; however, as he did so a customer drove up to the bank's automatic teller machine setting off bells inside the bank. Because the customer at the automatic teller machine could see inside the bank, the three robbers exited the bank quickly, taking $5,744 but leaving the videotape. Photographs were made from the videotape.
 
 
 12
 The robbers fled the bank in the stolen pickup; they drove to the switch site where Curtsinger met them in his truck. They loaded the cash and weapons into Curtsinger's truck, and Odom made sure that the stolen S-10 pickup was clear of fingerprints. Curtsinger drove to a residence which he was remodeling, and the four conspirators split up the money. Curtsinger took what he needed, leaving approximately $180 apiece for Gilbert, Odom, and Jaggers.
 
 
 13
 Jaggers and Curtsinger left and went to a car dealership to purchase a pickup truck. Thereafter, at about 5:00 p.m. Jaggers and Odom left the residence in a pickup borrowed from the car dealership and returned to 565 Paper Mill Road; they took the weapons that had been used in the robbery with them. Odom told Jaggers to hide the sawed-off shotgun under the trailer home. The .22 caliber rifle and BB pistol were kept at the trailer.
 
 
 14
 On December 9, 1991, the Kentucky State Police located the stolen S-10 pickup at the "switch" site where it had been abandoned. On December 23, 1991, the Kentucky State Police received an anonymous tip from "crime stoppers" that the people responsible for the robbery of the Farmers Bank were present on property owned by Elizabeth Curtsinger at 565 Paper Mill Road in Garrard County, Kentucky. On December 24, 1991, a Kentucky State Police officer and the Sheriff of Garrard County drove to the property and observed the three bank robbers depicted in the videotape. After noting that a number of other persons were present at the home, the two policemen radioed for assistance. While they waited, they kept the property under surveillance.
 
 
 15
 When Odom left the property with two other individuals in a green Chevrolet, the two officers radioed other units to stop his vehicle. The officers then approached the house trailer and told the occupants to come out. After a period of time, Gilbert exited the trailer and told the officers that there were children inside. Jaggers and Ginger Smith then exited the trailer. Gilbert and Jaggers were arrested and taken to the headquarters of the Lancaster Police Department. A Kentucky State trooper stopped the green Chevrolet and arrested Odom.
 
 
 16
 Subsequently, the police obtained a search warrant for 565 Paper Mill Road. The sawed-off shotgun used in the bank robbery was found under the trailer. The BB pistol, .22 caliber pistol, .22 caliber rifle, as well as jackets and shirts worn during the robbery, were also found inside the trailer. An ATF agent examined the sawed-off shotgun, .22 caliber pistol, and .22 caliber rifle and found that they were all functioning. The ATF agent also measured the sawed-off shotgun and determined that its barrel measured less than 18 inches, requiring that the gun be registered with the National Firearms Registration and Transfer Record. The ATF agent conducted a registration search and found that the sawed-off shotgun was unregistered.
 
 
 17
 After they were arrested, both Odom and Gilbert gave false names to the police. At an appearance in state court, Odom acknowledged his guilt; however, he claimed that Gilbert and Jaggers were not involved in the robbery. However, on December 26, 1991, after being advised of his rights, Odom told the police that the three were guilty of the bank robbery and that he, Gilbert, and Jaggers went into the bank. Odom also told the police that Curtsinger had planned the robbery and had supplied the guns and a vehicle used in the robbery.
 
 
 18
 Jaggers, with the assistance of counsel, cooperated with the authorities after his arrest and described the events surrounding the robbery. Odom, following Jaggers' example, entered pleas of guilty to all of the offenses for which he was charged. During his guilty pleas, Odom stated that Gilbert and Curtsinger were not involved.
 
 B.
 
 19
 Curtsinger, Gilbert, and Odom were indicted on February 20, 1992, by a federal grand jury. Curtsinger and Gilbert were named in seven counts of the eleven-count indictment. Jaggers was charged separately as a juvenile offender. He pled guilty to an act of juvenile delinquency, the robbery of the bank, in violation of 18 U.S.C. Sec. 5032 and was sentenced to two years detention on March 11, 1992.
 
 
 20
 On March 5, 1992, Odom entered a guilty plea to all of the charges against him. Because Odom had been diagnosed as having AIDS, he waived preparation of the presentence investigation report and asked for immediate sentencing. He was sentenced to 330 months of incarceration. Pursuant to a motion made by Curtsinger and Gilbert, Odom was ordered to submit to a videotape and stenographic deposition on March 11, 1992, to preserve his testimony. In the deposition, which was conducted by counsel for Gilbert, Curtsinger, and the United States, Odom testified that he committed the armed bank robbery with Jaggers and another individual, Terry Anderson, and that Gilbert and Curtsinger did not participate in the robbery.
 
 
 21
 On March 27, 1992, Gilbert filed a motion seeking dismissal of counts two, three, four, five, nine, and ten of the indictment on the grounds that they were multiplicious and double jeopardy violations. Gilbert also filed a motion seeking to suppress any photographic or in-court identification of himself by Mary Wood alleging that the photographic identification may be overly suggestive.
 
 
 22
 On April 16, 1992, the United States filed a written notice specifying Gilbert as an armed career criminal under 18 U.S.C. Sec. 924(e), on the ground that Gilbert had been convicted of three violent felonies in three different courts. On April 17, 1992, the United States served notice on Gilbert and Curtsinger that Odom's deposition testimony of March 11, 1992, was false and that Odom would appear as a witness for the United States. That same day, Curtsinger filed a motion seeking to sever count seven from the indictment.
 
 
 23
 A hearing on all pending motions was held by the district court on April 23, 1992. After hearing the testimony of Mary Wood, the court found that her identification of Gilbert was not the product of an overly suggestive photographic identification and denied the motion to suppress the in-court or photographic identification of Gilbert by Wood. The district court also determined that Gilbert's motion to dismiss counts two, three, four, five, nine, and ten was meritless and that Curtsinger's motion to sever count seven was meritless; both motions were overruled. Further, during the hearing the United States and Curtsinger agreed to stipulate that Curtsinger was a previously convicted felon.
 
 
 24
 Trial commenced on April 27, 1992. Twelve witnesses testified for the United States. Jane Heibenthal and Mary Wood identified Gilbert. Wood was extensively cross-examined concerning her misidentification of Curtsinger as Gilbert at a pretrial hearing. Both Jaggers and Odom testified as government witnesses at the trial. Moreover, both were extensively cross-examined. Jaggers was cross-examined in particular about his problems with drug abuse and truancy. Odom was cross-examined concerning his extensive criminal record and substance abuse. At trial, Odom testified that the statements he made prior to trial exonerating Gilbert and Curtsinger were not true. Odom testified that he gave such false statements prior to trial in response to threats by Gilbert and Curtsinger that they would have Jaggers, Ginger Smith, and him killed if he did not lie and cover up their involvement in the robbery. Odom testified that he was supposed to give Gilbert and Curtsinger an opportunity to win their case by making it look like Jaggers had implicated them in order to save himself.
 
 
 25
 During Jaggers' testimony, Odom's counsel indicated that Odom would exercise his Fifth Amendment privilege as to any criminal offense for which he had not been convicted. Consequently, counsel were ordered by the court not to inquire into matters which would provoke an assertion of the Fifth Amendment privilege.
 
 
 26
 Both Curtsinger's and Gilbert's counsel represented, however, that they possessed evidence that Jaggers and Odom participated in an unrelated robbery of a convenience store/gas station in Lexington. They sought to question both Jaggers and Odom about the robbery under Federal Rule of Evidence 404(b). The district court permitted a voir dire of Jaggers outside the jury's presence. At the voir dire, it was determined that Jaggers also would assert his Fifth Amendment privilege concerning the convenience store/gas station robbery. Subsequently, counsel for both Gilbert and Curtsinger proffered extrinsic evidence concerning the convenience store/gas station robbery; however, the district court found that the evidence was extrinsic and not admissible under either Fed.R.Evid. 404(b) or 608(b).
 
 
 27
 Odom testified and acknowledged both during direct and cross-examination that he had given false testimony during his videotaped deposition of March 11, 1992. After both Gilbert and Curtsinger had closed their defense, Curtsinger's counsel sought to reopen his defense and to play a portion of Odom's videotaped deposition for the jury. The district court found that playing the videotape would not assist the jury because Odom had acknowledged that he changed his story and had been extensively questioned about his giving of false testimony. Consequently, the district court refused to permit Curtsinger to reopen his defense and play the videotape.
 
 
 28
 At the conclusion of the evidence for the United States and at the conclusion of all the evidence, Gilbert moved for a judgment of acquittal under Fed.R.Crim.P. 29 as to counts nine and ten of the indictment. Curtsinger likewise moved for a judgment of acquittal as to all charges against him. These motions were overruled. Curtsinger, through Gilbert's counsel, requested a separate jury instruction on drug addict witnesses. The district court denied the request.
 
 
 29
 Following its deliberations, the jury returned guilty verdicts against Gilbert and Curtsinger on all counts. Subsequently, Curtsinger moved for a new trial under Fed.R.Crim.P. 33, alleging newly discovered evidence. The district court overruled the motion for a new trial.
 
 
 30
 At sentencing on August 2, 1992, Gilbert and Curtsinger objected to the calculation of their offense level under U.S.S.G. Sec. 2B3.1, which included the value of the stolen S-10 pickup used in the bank robbery. Gilbert also objected to being sentenced as an armed career criminal under 18 U.S.C. Sec. 924(e). The court found that the armed career criminal statute applied to Gilbert, that Gilbert also qualified as a career offender under the guidelines, and that under either situation, Gilbert's sentencing guideline range would be the same. Gilbert was sentenced to a total of 382 months of imprisonment to be served consecutively to terms of imprisonment which were to be imposed by the state of Kentucky. Curtsinger was sentenced to a total of 212 months of imprisonment. These timely appeals followed and were consolidated by an order of this court. In addition, Curtsinger was also permitted to submit a pro se brief supplementing the brief filed by his counsel.
 
 II.
 A.
 
 31
 Defendant Gilbert argues that this court should reverse his convictions on counts three, four, nine, and ten, asserting that the district court erred in not dismissing those counts on the grounds that they were multiplicious and violative of the Double Jeopardy Clause of the Fifth Amendment. This court reviews de novo a district court's denial of a motion to dismiss on double jeopardy grounds. United States v. Cameron, 953 F.2d 240, 243 (6th Cir.1992). The counts in which Gilbert was charged were: (1) count two--armed bank robbery in violation of 18 U.S.C. Sec. 2113(a) and (d); (2) count three--carrying a .22 caliber pistol during a crime of violence in violation of 18 U.S.C. Sec. 924(c); (3) count four--aiding and abetting Odom in carrying a sawed-off shotgun during a crime of violence in violation of 18 U.S.C. Secs. 2 and 924(c); (4) count five--being a felon in possession of a firearm, a .22 caliber pistol, in violation of 18 U.S.C. Sec. 922(g); (5) count nine--possessing a short-barrelled shotgun without proper registration in violation of 26 U.S.C. Sec. 5861(d); and (6) count ten--receipt, storage, sale, and disposal of six stolen firearms in violation of 18 U.S.C. Sec. 922(j).
 
 
 32
 The Double Jeopardy Clause of the Fifth Amendment prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes whenever each statute does not require proof of a fact which the other does not. Blockburger v. United States, 284 U.S. 299 (1932). Gilbert, relying on Grady v. Corbin, 495 U.S. 508, 510 (1990), asserts that similar proof was used to establish the various statutory offenses, and, therefore, the charges in counts three, four, nine, and ten were multiplicious and violative of the Double Jeopardy Clause. However, in United States v. Louisville Edible Oil Products, Inc., 926 F.2d 584, 588 (6th Cir.), cert. denied, 112 S.Ct. 177 (1991), this court stated:
 
 
 33
 We read Grady as barring successive prosecutions for the same offense, not simultaneous prosecutions for separate offenses.... We find nothing in Grady to alter the established principle that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."
 
 
 34
 (quoting Blockburger, 284 U.S. at 304).
 
 
 35
 In this case, it is readily apparent that each count charged against Gilbert has separate elements requiring proof of a fact which the others do not. Count two required proof of the robbery of a federally insured bank by the use of a dangerous weapon. Counts three and four required proof of the use or carrying of a separate firearm; count three required proof of the use or carrying of a .22 caliber pistol; count four required proof of the aiding and abetting of the carrying of the sawed-off shotgun; count five required proof that Gilbert had been previously convicted of a felony; count nine required proof that the sawed-off shotgun was a prohibited weapon which had not been registered on the National Firearms Registration and Transfer Record; and count ten required proof that the six firearms possessed by Gilbert and his co-defendants were stolen. Thus, the district court correctly determined that each count charged in the indictment against Gilbert alleged separate provisions requiring proof of a fact which the others did not. Accordingly, the district court properly denied Gilbert's motion to dismiss counts three, four, nine, and ten.
 
 
 36
 Gilbert further contends that his convictions for violations of 18 U.S.C. Sec. 924(c) (counts three and four) are violations of double jeopardy when combined with a conviction of armed bank robbery in violation of 18 U.S.C. Secs. 2113(a) and (d) (count two), because each offense has as an element of the offense the use of a dangerous weapon. In Busic v. United States, 446 U.S. 398 (1980), the Supreme Court noted that in Simpson v. United States, 435 U.S. 6 (1978), it had considered the relationship between Sec. 924(c) and the federal bank robbery statute, 18 U.S.C. Sec. 2113, which provides for an enhanced punishment where the felony is committed with a dangerous weapon. The Supreme Court stated that its language in Simpson stood for only one proposition, "that prosecution and enhanced sentencing under Sec. 924(c) is simply not permissible where the predicate felony statute contains its own enhancement provision." Busic, 446 U.S. at 404.
 
 
 37
 However, in 1986, subsequent to the Supreme Court's decisions in Busic and Simpson, Congress amended the provisions of 18 U.S.C. Sec. 924(c). In United States v. Moore, 917 F.2d 215, 229-30 (6th Cir.1990), cert. denied, 111 S.Ct. 1590 (1991), this court held that under the amended versions of 18 U.S.C. Sec. 924(c), it was no longer a violation of the Double Jeopardy Clause, as held in Busic and Simpson, when enhanced sentencing under Sec. 924(c) is applied in connection with a crime of violence where a firearm is used. Specifically, we quoted from the legislative history of the amendment to section 924(c), observing that the House and Senate Appropriations Committee stated that:
 
 
 38
 Part D of title X represents a complete revision of subsection 924(c) of title 18 to overcome the problems with the present subsection discussed above. As amended by Part D, section 924(c) provides for a mandatory, determinate sentence for a person who uses or carries a firearm during and in relation to any Federal "crime of violence," including offenses such as bank robbery or assault on a federal officer which provide for their own enhanced punishment if committed by means of a dangerous weapon.
 
 
 39
 Id. (quoting H.R. No. 98-1030, 98th Cong., 2d. Sess. 4, printed in 1984 U.S.Code Cong. & Admin.News, 3182, 3491-92). See also United States v. Larkin, 978 F.2d 964 (7th Cir.1992), cert. denied, 113 S.Ct. 1323 (1993), petition for cert. filed, No. 92-9012 (June 8, 1993). In Larkin the defendant, relying on the Supreme Court's decision in Simpson, challenged the district court's imposition of sentences on his two convictions of possessing a firearm in relation to a crime of violence under 18 U.S.C. Sec. 924(c)(1) which were consecutive to his two concurrent sentences on the underlying offenses, one count of armed bank robbery and one count of attempted armed bank robbery in violation of 18 U.S.C. Secs. 2113(a) and (d). The Seventh Circuit rejected defendant's challenge to his sentences, noting that "Congress amended the relevant statutes after Simpson to expressly provide for consecutive sentences under these circumstances." Id. at 972.
 
 
 40
 Thus, the sentence imposed on Gilbert by the district court was not a violation of the double jeopardy clause. Gilbert was sentenced to a term of 262 months under counts one and two. Counts three, five, nine, and ten were merged with count four for sentencing purposes. Under these counts a 120-month term of imprisonment, consecutive to the sentence imposed on counts one and two, was imposed as mandated by 18 U.S.C. Sec. 924(c)(1).
 
 B.
 
 41
 Defendant Curtsinger argues in his pro se supplemental brief that the district court abused its discretion by failing to sever the charges in count seven of the indictment from the remaining counts. Count seven charged Curtsinger with a violation of 18 U.S.C. Sec. 922(g), alleging that Curtsinger possessed two firearms after being convicted of crimes punishable by imprisonment for terms exceeding one year. Curtsinger asserts that the district court's failure to sever count seven was manifestly prejudicial under Fed.R.Crim.P. 14 because it resulted in the introduction of evidence of a prior felony conviction. However, in his pro se brief, Curtsinger has conceded that he does not contest the propriety of the joinder of count seven with the other charges against him under Fed.R.Crim.P. 8. Supplemental Brief for Appellant, p. 7.
 
 
 42
 This court will reverse a district court's denial of a motion for severance only for an abuse of discretion. United States v. Sivils, 960 F.2d 587, 594 (6th Cir.), cert. denied, 113 S.Ct. 130 (1992); United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.), cert. denied, 483 U.S. 1007 (1987). A defendant bears a heavy burden of showing that specific and compelling prejudice resulted from the joint trial and that such prejudice could have only been rectified by separate trials. Sivils, 960 F.2d at 594. Moreover, even if a defendant established some potential harmful effect on the jury's verdict, such as confusion, the harmful effect must be balanced against society's need for speedy and efficient trials. Id.
 
 
 43
 In this case, counsel for the United States proposed a stipulation that Curtsinger had been convicted of a crime punishable by imprisonment of a term exceeding one year in a Kentucky state court. The district court, after considering the proposed stipulation, asked Curtsinger's counsel if he would accept the stipulation, noting that in the court's opinion the stipulation "eliminate[d] any possible prejudice" to Curtsinger. J.A. 367-71. Counsel accepted the stipulation. Moreover, without objection by any of the parties, the district court instructed the jury that the defendants were only on trial for the particular crimes in the indictment, and the court specifically instructed the jury that the evidence of Curtsinger's prior conviction could be considered only with regard to count seven and was not to be considered for any other purpose.
 
 
 44
 Here, the stipulation, agreed to by all the parties, removed any mention of Curtsinger's multiple felony convictions, and the court appropriately instructed the jury that the stipulation could only be considered with regard to count seven and for no other purpose. Thus, Curtsinger has failed to establish that the district court abused its discretion in denying his motion for severance of count seven, because Curtsinger has failed to satisfy his heavy burden of establishing prejudice arising from the failure to sever.
 
 C.
 
 45
 Defendant Gilbert argues that his convictions should be reversed, asserting that the in-court identification of him by Mary Wood, one of the tellers at the Farmers Bank, was the result of an impermissibly suggestive prior identification. Wood identified Gilbert based upon a photospread shown to her by FBI agent Smith. During an evidentiary hearing, both Wood and Smith testified and the photospread was examined by the district court. At the conclusion of the hearing, the district court determined that Wood had independently described a number of salient points concerning the robbers, including Gilbert's appearance, prior to being shown the photospread and that the photospread was fair. Accordingly, the district court denied the motion to suppress Wood's in-court identification.
 
 
 46
 In addition, during the hearing the district court allowed Gilbert to leave the courtroom, while Curtsinger was present at the defense table. After identifying Gilbert from the photospread, Wood erroneously identified Curtsinger as the third bank robber. Prior to Wood's testimony, Gilbert renewed his motion to suppress her in-court identification, and the district court again denied the motion.
 
 
 47
 During Wood's testimony at trial, she identified Gilbert as the bank robber and matched Gilbert to the photographs made from the videotape of the robbery. Gilbert's counsel extensively cross-examined Wood as to her mistaken identification of Curtsinger at the pretrial hearing. Wood acknowledged her mistake and stated that she had been misled because she was asked to identify Gilbert from the individuals in the courtroom when in fact he was not present in the courtroom at all. During her testimony, Wood was also shown the .22 caliber pistol allegedly carried by Gilbert during the robbery, and she stated that the pistol looked like the gun carried by the robber who came into the bank's kitchen. Out of the jury's presence, the district judge also noted that Curtsinger came to the pretrial hearing without his glasses in an attempt to mislead the witness.
 
 
 48
 Gilbert argues that his conviction should be reversed because of the admission of Wood's in-court identification. However, although Gilbert asserts that Wood's identification of him was unreliable and the product of an unduly suggestive pretrial procedure, he has not specified how the photographic lineup shown to Wood by Agent Smith was suggestive. Gilbert also argues that Wood's identification of him was unreliable because she had seen a newspaper photograph identifying him as one of the robbers before she had been shown the photographic lineup. However, Wood testified that she did not see the newspaper photograph until some time after she had identified Gilbert from the photographic lineup.
 
 
 49
 "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside ... only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Williams v. Lockhart, 736 F.2d 1264, 1266 (8th Cir.1984) (quoting Simmons v. United States, 390 U.S. 377, 394 (1968)). The court must consider the totality of the circumstances in determining whether identification procedures denied a defendant due process of law. Id.; United States v. Causey, 834 F.2d 1277, 1285 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988). "[A] defendant is denied due process only when the identification evidence is so unreliable that its introduction rendered a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." Id. (quoting Smith v. Perini, 723 F.2d 478, 482 (6th Cir.1983), cert. denied, 466 U.S. 941 (1984). There are five factors to consider; namely, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Id. (quoting Neil v. Biggers, 409 U.S. 188, 199 (1972)). Furthermore, where a witness has viewed a newspaper photograph, there are two inquiries: (1) whether viewing the photograph was unduly suggestive; and, if so, (2) whether under the totality of the circumstances, there was sufficient independent indicia of the reliability of the witness's identification. United States v. Monsour, 893 F.2d 126, 128 (6th Cir.1990).
 
 
 50
 In this case, the totality of the circumstances demonstrate a strong and reliable basis for Wood's identification. First, as the district court noted, Wood observed Gilbert for at least a full twenty seconds before he escorted her out of the bank's kitchen; later she observed while he held her at gunpoint and again as he fled the bank. Further, during the pretrial hearing, the district court permitted Gilbert's counsel to mix up the photographs in the photographic lineup, and Wood picked out Gilbert's photograph without any hesitation. Further, the district court noted that the photospread was fair; all the men were white; about the same age; at least two of the six, if not more, had receding hairlines like Gilbert's; and all of the men had facial hair of some sort. In addition, Wood identified Gilbert from the photographic lineup on January 13, 1992, the only time she was shown a lineup, and she testified that she was not shown and did not see photographs of anyone alleged to be the bank robber at any time prior to January 13, 1992. Wood was able to give a fairly accurate description of Gilbert following the robbery, describing him as having dark hair, a receding hairline, ruddy complexion, a goatee, 5'7"' to 5'8", and between 150 to 175 pounds. Not only did Wood identify Gilbert from the photographic lineup, she identified another of the robbers from a photospread. Therefore, Gilbert's argument that the district court erred in not suppressing Mary Wood's in-court identification of him is meritless.
 
 D.
 
 51
 Defendant Curtsinger argues in his pro se brief that the district court's admission of Odom's testimony that Curtsinger threatened to harm Odom, Jaggers, and Ginger Smith if Odom did not lie to protect Curtsinger was a violation of Federal Rule of Evidence 403. Curtsinger asserts that the district court erred under Rule 403 by allowing Odom to testify that he considered Curtsinger's treats to be genuine because of Curtsinger's affiliation with a "brotherhood." Odom was going to testify that he took Curtsinger's threats seriously because Curtsinger was a member of the Aryan Brotherhood, a white supremacist organization. Curtsinger filed objections to Odom's proposed testimony in a motion in limine. The district court considered Curtsinger's motion and ruled that Odom could testify as to the threats, but that the use of the word "Aryan" in connection with the word "brotherhood" would be unfairly prejudicial under Rule 403. As a consequence of its ruling, the district court ordered that no mention of the word "Aryan" could be made by Odom during his testimony, but that Odom could use the word "brotherhood" when testifying about Curtsinger's alleged threats.
 
 
 52
 This court reviews a district court's evidentiary rulings for an abuse of discretion. United States v. Paulino, 935 F.2d 739, 754 (6th Cir.), cert. denied, 112 S.Ct. 315 (1991); United States v. Moreno, 933 F.2d 362, 375 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." Davis v. Jellico Community Hosp. Inc., 912 F.2d 129, 133 (6th Cir.1990).
 
 
 53
 Although it is not specifically listed in Fed.R.Evid. 404(b), "spoliation evidence, including evidence that [a] defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt." United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir.1986), cert. denied, 480 U.S. 922 (1987). See also United States v. Gatto, 995 F.2d 449, 454 (3d Cir.1993) ("[i]t is well-established that evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt, as well as to impeach a witness whose testimony was influenced by such conduct."). However, although such spoliation evidence is admissible, "spoliation evidence should not be admitted if its probative value 'is substantially outweighed by the danger of unfair prejudice." Mendez-Ortiz, 810 F.2d at 79.
 
 
 54
 In this case, the district court did not abuse its discretion in permitting Odom to testify that he took Curtsinger's threats seriously due to his membership in a brotherhood. The district court balanced the probative value of Odom's testimony against the danger of unfair prejudice, and it imposed limitations on Odom's testimony which tempered the inflammatory nature of the testimony, thereby mitigating any unfair prejudice which might arise from the testimony. In addition, the district court noted that Odom's testimony had probative value because it was an attempt to explain that Odom's inconsistent statements resulted from threats.
 
 E.
 
 55
 Defendants Gilbert and Curtsinger argue that their convictions should be reversed because the district court prohibited the presentation of extrinsic evidence and restricted cross-examination of both Jaggers and Odom concerning allegations of an uncharged robbery of a Kocolene gas station in Lexington, Kentucky, in November 1991. Gilbert and Curtsinger assert that the evidence was admissible under two different theories: (1) as evidence of a pattern of conduct or ongoing plan under Fed.R.Evid. 404(b); and (2) as impeachment evidence under either Fed.R.Evid. 404(b) or Fed.R.Evid. 608(b).
 
 
 56
 Prior to defendants' attempt to introduce such evidence, the district court determined that the alleged robbery of the Kocolene gas station was unknown to the United States and was not the subject of any plea agreement. The district court also determined from Jaggers' and Odom's counsel that if asked about the alleged robbery of the Kocolene gas station, both witnesses intended to assert their Fifth Amendment privilege with regard to the uncharged misconduct. Thereafter, the district court refused several requests from both Gilbert and Curtsinger to cross-examine Jaggers and Odom concerning their alleged participation in the robbery of the Kocolene station and to present extrinsic evidence of Jaggers' and Odom's participation in the alleged robbery.
 
 
 57
 However, in a hearing held out of the presence of the jury, defendants' counsel were permitted to present the testimony of Teresa Marshall and Donald Stevens, the victims of the armed robbery of the Kocolene gas station at New Circle Road in Lexington, Kentucky, on November 2, 1991. Both Marshall and Stevens gave descriptions of the two robbers, and both stated that they had not been shown any photographic lineups of the alleged robbers by the police. However, when they were shown photographs of Jaggers and Odom, both testified that the robbers were shown in the photographs. Following this testimony, Curtsinger and Gilbert again moved the court to allow Marshall and Stevens to testify before the jury under Rules 404(b) and 608(b). The motion was denied.
 
 
 58
 Curtsinger argues that the proffered evidence concerning the robbery of the Kocolene station is admissible under Rule 404(b) as evidence of the preparation, plan, and knowledge of Jaggers and Odom concerning the robbery of the Farmers Bank. However, both Jaggers and Odom testified that they robbed the Farmers Bank, and they were extensively cross-examined by both defendants' counsel as to the aspects of their participation in the robbery.
 
 
 59
 Where as here, the jury was virtually inundated with negative information about Jaggers and Odom and their credibility, the jury had enough information absent the limits on cross-examination to assess their credibility. United States v. Martin, 920 F.2d 393, 397 (6th Cir.1990). Moreover, even if the evidence concerning the gas station robbery were allowed, the participation of Jaggers and Odom in the gas station robbery could not eliminate Curtsinger or Gilbert from participation in the robbery of the bank. In this case, the testimony of Jaggers, Odom, and the two bank tellers, Wood and Heibenthal, as well as the videotape of the robbery, showed that there were three robbers. In addition, Wood and Heibenthal identified Gilbert as one of the three robbers, and Jaggers and Odom testified as to Curtsinger's participation. Further, the United States did not charge that the robbery of the gas station was part of the plan to rob the bank. Indeed, the evidence showed that the getaway vehicle and firearms used in the bank robbery had been previously stolen by Jaggers and Odoms. Moreover, there is no evidence of record to suggest that the robbery of the Kocolene station was done for the purpose of financing the bank robbery. Rather, it appears to be Gilbert's and Curtsinger's argument that the evidence of the Kocolene gas station robbery would show that the robbery of the Farmers Bank was part of a continuous and exclusive conspiracy between Odom and Jaggers. However, Rule 404(b) is inapplicable where evidence is sought to be admitted to prove continued involvement in a conspiracy rather than the commission of other similar crimes. See United States v. Walton, 908 F.2d 1289, 1299 (6th Cir.), cert. denied, 498 U.S. 990 (1990).
 
 
 60
 Curtsinger and Gilbert assert that Rule 404(b) allows evidence of other crimes, wrongs, or acts to impeach a witness. However, Rule 404(b) provides in pertinent part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." See also United States v. Holt, 817 F.2d 1264, 1268 (7th Cir.1987) (Rule 404(b) prohibits the introduction of evidence of specific wrongs committed by a defendant if the purpose for the introduction of such evidence is to show his propensity for wrongdoing). In United States v. Bakke, 942 F.2d 977, 982-83 (6th Cir.1991), this court held that in a prosecution for conspiracy, testimony concerning the involvement of one of the defendants in a totally unrelated crime was not relevant and not admissible as "other crimes" evidence under Rule 404(b). The same situation exists in this case; the Kocolene gas station robbery was totally unrelated to the conspiracy to rob or the robbery of the Farmers Bank. Thus, this "other crimes" evidence was not admissible under Rule 404(b) as its purpose was to impeach Jaggers and Odom by showing their propensity for wrongdoing. The district court also found that the evidence was more prejudicial than probative.
 
 
 61
 Defendants Gilbert and Curtsinger further argue that the district court should have allowed them to cross-examine Jaggers and Odom about the alleged gas station robbery for impeachment purposes under Rule 608(b). However, at the time defense counsel sought to question Odom and Jaggers about the alleged gas station robbery, the district court had already determined that both Jaggers and Odom would assert their Fifth Amendment privilege and refuse to testify about the alleged events. Rule 608(b) expressly provides that "the giving of testimony ... by any ... witness, does not operate as a waiver of the ... witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility." Thus, the district court did not err in refusing to allow defense counsels to cross-examine Jaggers and Odom about their alleged involvement in the Kocolene robbery, when such questioning would have been solely for the purpose of impeachment, i.e., attacking their credibility.
 
 
 62
 Further, the district court did not err in excluding the testimony of Marshall and Stevens concerning the robbery of the Kocolene gas station on November 2, 1991. Rule 608(b) also expressly provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." Accordingly, the district court did not abuse its discretion under either Rule 404(b) or Rule 608(b) in excluding extrinsic evidence of Jaggers' and Odom's alleged participation in the gas station robbery and in refusing to allow defense counsels to cross-examine them concerning such alleged misconduct.
 
 F.
 
 63
 Defendant Curtsinger argues that his conviction should be overturned on the grounds that the district court erred in failing to allow Curtsinger to reopen his case and play the videotape of Gary Odom's deposition to show Odom's demeanor during the deposition. As previously noted, Odom was deposed, in a videotaped deposition, by counsel for all the parties prior to the trial in order to preserve his testimony. At the trial, Odom was called as a witness by the government. During both direct examination and extensive cross-examination, Odom agreed that he made statements in his deposition that were inconsistent with his trial testimony; namely, that Curtsinger and Gilbert were involved in the bank robbery, and he explained those statements. Curtsinger's counsel did not seek to play any portion of the videotaped deposition on cross-examination. Rather, after the United States closed its case-in-chief, after Gilbert had closed his case, and after Curtsinger's counsel announced that he had closed his case, Curtsinger's counsel approached the bench and sought to reopen his case in order to play a portion of Odom's videotaped deposition.
 
 
 64
 When the district court asked Curtsinger's counsel whether any part of Odom's testimony during the six-minute portion of the videotape which counsel sought to play for the jury was inconsistent with Odom's testimony at trial, Curtsinger's counsel replied "not in the words he said, but in the demeanor." J.A. 904-05. Thus, Curtsinger's counsel acknowledged that the six-minute portion of the videotape was not inconsistent with what Odom had testified at trial on direct and cross-examination. Moreover, during cross-examination by Curtsinger's counsel, Odom admitted that during the videotaped deposition he "ranted and raved" and "pointed at people," in addition to stating that Curtsinger and Gilbert were not involved in the robbery. J.A. 817.
 
 
 65
 Therefore, at trial, Curtsinger's counsel had a full opportunity to cross-examine Odom about both his statements and his demeanor during the videotaped deposition. "It is well-settled that testimony presented at trial provides a defendant with an adequate occasion to fully examine the witness." United States v. Taplin, 954 F.2d 1256, 1258 (quoting Mattox v. United States, 156 U.S. 237 (1895)). The district court denied permission to reopen the case, determining that the videotape would serve no additional impeachment purpose and that the evidence concerning Odom's change of story had been clearly presented at trial. Furthermore, Fed.R.Evid. 403 provides that evidence may be excluded if its probative value is outweighed "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Therefore, the district court did not abuse its discretion by excluding the playing of portions of the videotape by Curtsinger's counsel.
 
 G.
 
 66
 Defendant Gilbert argues that the district court erred by denying his motion for acquittal under Fed.R.Crim.P. 29. He asserts that there was insufficient evidence under counts nine and ten to show: (1) that he possessed the sawed-off shotgun, as charged in count nine; (2) that he had knowledge that the sawed-off shotgun was illegal; (3) that the sawed-off shotgun was operable; and (4) that he had knowledge that the weapons were stolen, as charged in count 10. Curtsinger argues in his pro se brief that insufficient evidence supports his convictions because the testimony of Jaggers and Gilbert was not credible.
 
 
 67
 "In determining whether sufficient evidence supports a conviction, we 'must consider all the evidence in a light most favorable to the government and then determine whether there is any evidence from which a reasonable jury could find guilt beyond a reasonable doubt." United States v. Driscoll, 970 F.2d 1472, 1483 (6th Cir.1992) (quoting United States v. Walton, 908 F.2d 1289, 1294 (6th Cir.), cert. denied, 498 U.S. 990 (1990)), cert. denied, 113 S.Ct. 1056 (1993). When deciding a motion for judgment of acquittal, "neither the district court nor the court of appeals may make independent determinations regarding the credibility of witnesses or the weight to be given such evidence." United States v. Davis, 981 F.2d 906, 908 (6th Cir.1992), cert. denied, 113 S.Ct. 2361 (1993).
 
 
 68
 Curtsinger's argument that Odom's and Jaggers' testimony lacks credibility and is therefore insufficient to support his convictions is meritless. As noted above, in reviewing a motion for a judgment of acquittal this court does not make determinations as to the credibility of witnesses. Further, "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." United States v. Adamo, 742 F.2d 927, 935 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985).
 
 
 69
 Gilbert argues that he was entitled to a judgment of acquittal on counts nine and ten for the reasons stated above. In this case, based upon the testimony of Jaggers, Odom, Wood, Heibenthal, Kentucky State Patrol Officer Isaacs, and the ATF firearms expert, Simms, as well as the videotape of the robbery from the Farmers Bank, the jury could have found (1) that Gilbert participated in discussions planning the bank robbery with Odom, Jaggers, and Curtsinger; (2) that Gilbert was aware that Odom and Jaggers had stolen the firearms; (3) that the stolen firearms were taken to Gilbert's residence, where Gilbert inspected them along with Odom and Jaggers; (4) that Gilbert carried a stolen .22 caliber pistol during the robbery of the bank, while at the same time Odom carried the sawed-off shotgun, and both men used the weapons to force the bank's tellers to the floor as well as to give money to the robbers; (5) that the barrel of the shotgun had been sawed off to a length that was 4 inches shorter than the length of a shotgun which was not required to be registered; and (6) that the shotgun and .22 caliber pistol used in the bank robbery were functional as firearms. Based upon these facts, a rational jury or juror could find that Gilbert, as a co-conspirator along with Odom, Jaggers, and Curtsinger, knowingly possessed operational stolen firearms, including a sawed-off shotgun, which were carried and used during the robbery of the Farmers Bank. In United States v. Simpson, 979 F.2d 1282, 1285 (8th Cir.1992), cert. denied, 113 S.Ct. 1345 (1993), the Eighth Circuit stated:
 
 
 70
 Here, Mark Grotte robbed a bank using a firearm. Simpson's [the defendant] conduct was integral to the crime. She provided the transportation and the means of concealment. Simpson also knew that Grotte possessed a firearm and planned to use it in committing the robbery. Because Simpson's actions aided the commission of the armed bank robbery, Grotte's actions, and his gun, became hers in the eyes of the law.
 
 
 71
 (Emphasis added). See also United States v. Morrow, 977 F.2d 222, 230-31 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 2969 (1993). For the same reasons, the jury could find that Gilbert possessed the sawed-off shotgun in this case.
 
 
 72
 Gilbert also argues, citing this court's decision in United States v. Williams, 872 F.2d 773 (6th Cir.1989), that because the barrel of the shotgun was only slightly shorter than the length at which the gun was required to be registered, the government has failed to show that he knew the gun had to be registered. However, Williams is distinguishable from this case. In Williams, this court reversed defendant's convictions on the charges of knowingly transferring unregistered fully automatic weapons in violation of 26 U.S.C. Sec. 5861(e). The evidence showed that the defendants purchased semi-automatic rifles, which were not required to be registered. However, the rifles had been converted to fully automatic rifles, which required registration, "by internal modifications which did not change the external appearance of the gun." Id. at 774. Here, however, the shortening of the shotgun barrel was an obvious external modification to the gun. Thus, Gilbert's challenge to the denial of his motion for a judgment of acquittal is meritless.
 
 H.
 
 73
 Defendant Curtsinger argues that his conviction should be reversed based upon the comments by the prosecutor during closing argument. However, in this connection, we note the closing argument of co-defendant Gilbert's counsel who stated.
 
 
 74
 You have heard testimony about a videotape. You saw that videotape. I don't need to tell you anything. As Detective Isaacs told you, it leaves a lot to be desired in terms of quality, and it simply is not the best tape in the world. But Isaacs also told you that based on seeing that and based on taking the copies of those photos from that videotape, he knew immediately when he arrested Pete Gilbert on December 24th that he was one of the robbers, when by his own admission he said it was a bad videotape. But he knew immediately, according to his testimony. He also told you what color Pete Gilbert's eyes are. They are not blue. He has got hazel eyes. When I was thinking about the videotape, I was reminded of another case that we heard about last week that also involved a videotape. And it was a videotape where it left nothing to the imagination about what was happening in that videotape. Later, as it turned out, it left nothing to the imagination about who the actors were in that videotape. It was a videotape that clearly showed what was going on. In fact, it is a videotape that the whole nation saw. And a jury saw that videotape, which was a lot better than the one you saw in this case, and that jury had a reasonable doubt. And they voted accordingly, under the instructions that they were given.
 
 
 75
 J.A. 944. The references made by Gilbert's counsel were to the state trial in the Rodney King beating case, which had concluded a week earlier in California. Curtsinger's counsel made no objection to this argument.
 
 
 76
 In his closing argument, counsel for the United States stated:
 
 
 77
 Ladies and gentlemen, I again submit to you the evidence that's presented in this case. The evidence that's presented in this case, not "what ifs", establishes the guilt of these defendants as charged as to each count. The time for my argument is finished. The time for all arguments has ended. All the evidence is in.... It is not a game. Your job is to continue. It is as serious as it gets, ladies and gentlemen. What you do, you evaluate evidence just as another jury who heard and saw a videotape is quite serious. I know that you will take it that way. I know that you will carefully evaluate this evidence, and you will not decide this case on a whim, on "what ifs", but on the evidence that is presented to you by witnesses in this case.
 
 
 78
 J.A. 946-47.
 
 
 79
 Subsequently, Curtsinger's counsel moved for a mistrial. The district court denied the motion noting that the remarks did not improperly affect the jury and that no contemporaneous objection was made at the time of the remarks.
 
 
 80
 Improper argument by the prosecutor denies a defendant a fair trial when such argument was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." United States v. Castro, 908 F.2d 85, 89 (6th Cir.1990) (quoting United States v. Vance, 871 F.2d 572, 577 (6th Cir.), cert. denied, 493 U.S. 933 (1989)). "Inappropriate remarks by the prosecutor do not alone justify reversal of a criminal conviction in an otherwise fair proceeding, as long as the jury's ability to judge the evidence fairly remains intact." Castro, 908 F.2d at 89. "Courts are generally reluctant to find reversible error unless the prosecutorial misconduct was egregious, continuous, and uncorrected by judicial intervention." United States v. Morrow, 977 F.2d 222, 229 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 2969 (1993). "[T]he complained-of conduct will not rise to reversible error, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury." Id. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error free, perfect trial, and ... the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-09 (1983).
 
 
 81
 In this case, the prosecutor's remark did not permeate the entire proceedings so as to render trial unfair. Taken in context, the prosecutor's remark was not an attempt to influence the jury but rather an effort to urge the jury to give serious consideration to the evidence actually presented in the case. Moreover, the prosecutor's passing reference to the King case was far more abbreviated than the reference made by counsel for Curtsinger's co-defendant, remarks to which Curtsinger voiced no objection. Moreover, as described above, there was overwhelming evidence of Curtsinger's guilt presented at the trial. Therefore, the district court did not err in not granting Curtsinger's motion for a mistrial.
 
 I.
 
 82
 Defendant Curtsinger argues in his pro se brief that the district court erred when it refused to give a separate addict witness instruction to the jury. "The standard on appeal for a [district] court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984). "This court has long recognized the importance of an addict-informant instruction in appropriate cases." United States v. Brown, 946 F.2d 1191, 1195 (6th Cir.1991). However, no per se rule requires that an addict-informant instruction be given in all cases involving the testimony of an addict-informant, instead "the need for such an instruction depends on the circumstances of each case." Id.
 
 
 83
 In this case, Jaggers and Odom admitted they had a prior history of abuse of controlled substances; however, both testified that they were not under the influence of controlled substances at the time of the robbery. Further, the district judge, who had the opportunity to observe the demeanor of both Jaggers and Odom during their testimony, rejected the defendants' requests for the proffered addict-informant instruction. The court stated there was "no evidence that at the time this offense was committed that [Jaggers and Odom] were under the influence of any drugs." J.A. 933. In addition, the court gave the jury instructions as to the credibility of witnesses, as well as separate instructions on the impeachment of witnesses; namely, impeachment by prior inconsistent statement, impeachment by a prior conviction, testimony of a witness under a grant of immunity or reduced criminal liability, and testimony of an accomplice.
 
 
 84
 Thus, based upon the testimony presented at trial, not only was the jury aware that both Jaggers and Odom had a controlled substance problem, but also the general instructions given to the jury alerted the jury to the credibility problems present in this case and provided sufficient protection against the possibility of unfair prejudice. Further, there is less need for a special jury instruction about the credibility of an addict informer where the jury is aware that the witness was an addict and where there was substantial corroboration for the witness' testimony. United States v. McGhee, 882 F.2d 1095, 1100 (6th Cir.1989). Not only was the jury aware of Jaggers' and Odom's controlled substance problem, there was strong corroboration for their testimony. There was independent evidence which connected Curtsinger to the robbery in addition to Jaggers' and Odom's corroborating each other's testimony.
 
 
 85
 Furthermore, the presence of strong corroboration for Odom's and Jaggers' testimony distinguishes this case from this court's decision in United States v. Griffin, 382 F.2d 823 (6th Cir.1967), which is relied on by Curtsinger. In Griffin, this court found plain error in the district court's failure to give an addict-informer instruction because the addict informer's testimony was corroborated on only minor points and because there was no direct untainted evidence against the defendant. Id. at 828. Here, however, both Odom's and Jagger's testimony substantially corroborated the other's testimony as to the major aspects of the case, not just the minor points. Therefore, the district court did not err in refusing to give the proffered addict-informer instruction.
 
 J.
 
 86
 Defendant Curtsinger argues that his conviction should be reversed on the grounds that the district court erred in denying his motion for a new trial based upon newly discovered evidence. At trial, both Jaggers and Odom testified that after the robbery, the proceeds were divided up in the basement of a home on which Curtsinger and others were performing a remodeling job. Jaggers testified that after the money was divided, he and Curtsinger went to Paul Miller Ford, an automobile dealership in Lexington. According to Jaggers, Curtsinger talked to a friend who was a salesman at Paul Miller Ford, whom Jaggers did not know, and Curtsinger persuaded the friend to let them have an old Ford truck overnight to see if they wished to purchase it. The truck was described by Jaggers as a white truck with a long bed. Both Jaggers and Odom testified that they used such a truck to return to 565 Paper Mill Road, since they had earlier abandoned the stolen S-10 pickup at the switch site.
 
 
 87
 Following the trial, Curtsinger filed a motion for a new trial, alleging that he had learned that following Jaggers' testimony, FBI agent Sam Smith had spoken to Nick Gillum, a friend of Curtsinger and a salesman at Paul Miller Ford, and that Gillum had told Smith that he had no knowledge about Curtsinger's presence at Paul Miller Ford on November 19, 1991, or about the procurement of any pickup truck by Curtsinger on that date.
 
 
 88
 A hearing was held on the motion for a new trial on July 24, 1992, at which Curtsinger's counsel asserted that his information from the interview with Gillum could have been used for impeachment purposes. Agent Smith testified that he spoke to Gillum prior to trial and that Gillum told him he had no recollection of the events of November 19, 1991. Agent Smith further testified that after Jaggers testified, he recontacted Gillum and asked him if he met with Curtsinger on November 19, 1991, and if Curtsinger and another individual borrowed a truck or vehicle from his place of business. According to Smith, Gillum again told him that he did not remember, but that he did not think such events happened. The district court found that since Gillum's statements were not remotely exculpatory, the United States did not err in not turning over the material to the defense. The district court further found that Curtsinger knew Gillum and knew that he worked at Paul Miller Ford, since Curtsinger had bought several vehicles from him, and that Paul Miller Ford was one of the largest car dealerships in Lexington covering approximately two city blocks and with hundreds of employees.
 
 
 89
 The decision to grant or deny a new trial rests within the district court's sound discretion and will not be reversed on appeal absent an abuse of discretion. United States v. Seago, 930 F.2d 482, 488 (6th Cir.1991). Furthermore, the term "newly discovered evidence" within the meaning of Fed.R.Crim.P. 33 has been restricted by certain limitations on the type of newly discovered evidence which warrants a new trial. The defendant must establish that such new evidence was (1) discovered after trial; (2) could not have been discovered earlier with due diligence; (3) is material and not merely cumulative or impeaching; and (4) would likely produce an acquittal. Id. In addition, the government has an obligation, under Brady v. Maryland, 373 U.S. 83 (1963), to turn over to the defense evidence in its possession which is favorable to the accused and material to the issue of guilt or punishment. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988) (quoting Pennsylvania v. Ritchie, 480 U.S. 39 (1987)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "[T]he Brady doctrine, in its purest form, is the rule of law that the Due Process Clause violated when the government achieves a conviction ... by withholding evidence 'so clearly supportive of a claim of innocence that it give the prosecution notice of a duty to produce.' " Presser, 844 F.2d at 1281 (quoting United States v. Agurs, 427 U.S. 97, 107 (1976)). However, failure to disclose impeaching material is constitutional error only when it deprives a defendant of a fair trial by undermining confidence in the outcome of trial. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985).
 
 
 90
 In this case, the district court did not err in denying Curtsinger's motion for a new trial. First, the evidence was not newly discovered evidence which warrants the granting of a new trial, because Curtsinger could have obtained Gillum's statement with due diligence. Curtsinger and Gillum had been acquainted for a number of years, and Curtsinger was aware that Gillum was employed at Paul Miller Ford. Second, the evidence is of such an equivocal nature that it could not possibly have changed the outcome of the trial. The gist of Gillum's statement to FBI agent Smith was that he did not remember the events of November 19, 1991, and, hence, did not remember if he had dealt with Curtsinger or not. Moreover, Jaggers did not remember the name of the individual with whom he and Curtsinger allegedly dealt at Paul Miller Ford. Given the size of the dealership, as noted by the district court, even if Gillum had testified that he did not deal with Curtsinger and Jaggers on November 19, 1991, such testimony would not even be effective in impeaching or rebutting Jaggers' testimony.
 
 K.
 
 91
 Defendant Gilbert argues that the district court erroneously sentenced him as an "armed career criminal" under 18 U.S.C. Sec. 924(e). He asserts that (1) two of the three violent felony convictions used as predicates for the armed career criminal enhancement stemmed from a crime spree and constituted only one offense; and (2) the third violent felony conviction, an armed robbery conviction from Michigan which was based upon the use of a blackjack, does not constitute a violent felony under Sec. 924(c). In this case, the notice informing Gilbert that the United States sought to have him sentenced as an armed career criminal specified the three convictions upon which the United States would rely. These were a conviction of armed robbery on October 14, 1989, in the Branch County, Michigan, Circuit Court; a conviction of robbery first degree in the Whitley County, Kentucky, Circuit Court on May 14, 1980; and a conviction of robbery first degree and persistent felony offender second degree in the Fayette County, Kentucky, Circuit Court on June 17, 1980. The United States established the existence of these three convictions through the use of public records which were introduced into evidence at sentencing and also described in the presentence investigation report.
 
 
 92
 The police records indicate that on June 8, 1979, at approximately 11:00 p.m., Gilbert and an accomplice robbed H & N Liquors in Lexington, Kentucky, using a .38 caliber revolver. On June 9, 1979, Gilbert and the same accomplice robbed the Townhouse Hotel in Corbin, Kentucky, using a pistol. The armed robbery in Corbin, Kentucky, occurred approximately three to three and one-half hours after the robbery in Lexington. Lexington is in Fayette County; Corbin is in Whitley County. The district court further noted that Fayette and Whitley Counties are approximately 90 miles apart. Finally, the district court reviewed the judgments from the two Kentucky convictions and found that the two convictions did not refer to one another and were not disposed of together.
 
 
 93
 Relying on this court's decision in United States v. Roach, 958 F.2d 679 (6th Cir.), cert. denied, 113 S.Ct. 135 (1992), the district court determined that the two convictions were separate from one another, and that each counted as a separate conviction for the purposes of sentencing Gilbert as an armed career criminal. Multiple convictions must originate from multiple episodes that are distinct in time in order to constitute multiple convictions. United States v. Pedigo, 879 F.2d 1315, 1317 (6th Cir.1989). The majority of courts have concluded that if the predicate offenses occurred on occasions different from one another, they are not considered one criminal episode. Roach, 958 F.2d at 684. The statute, 18 U.S.C. Sec. 924, requires that the felonies used to enhance a sentence under 18 U.S.C. Sec. 922(g) be committed on separate occasions; however, it imposes no requirements as to timing. United States v. Hayes, 951 F.2d 707, 709 (6th Cir.1991), cert. denied, 112 S.Ct. 1694 (1992). In United States v. Brady, 988 F.2d 664 (6th Cir.1993) (en banc), petition for cert. filed, No. 92-9206 (June 21, 1993), this court held that where a defendant committed armed robberies of different victims at different locations approximately 30 minutes apart, the crimes were separate offenses for the purposes of Sec. 924. In this case, defendant Gilbert robbed two different businesses, which were approximately 90 miles apart, with at least three hours intervening between the two robberies. Accordingly, the district court did not err in concluding that the two convictions were separate convictions for purposes of 18 U.S.C. Sec. 924.
 
 
 94
 Gilbert further contends that under Sec. 924(e)(2)(B) his armed robbery conviction in Branch County, Michigan, is not a violent felony because he used a blackjack to commit the offense. Title 18 U.S.C. Sec. 924(e)(2)(B)(ii) permits the inclusion of a conviction involving conduct which presents a serious potential risk of physical injury to another as a violent felony for purposes of Sec. 924(c). See United States v. O'Neal, 937 F.2d 1369, 1372 (9th Cir.1990). At sentencing, Gilbert's counsel acknowledged that it was possible to kill someone with a blackjack.
 
 
 95
 In United States v. Preston, 910 F.2d 81, 85 (3d Cir.1990), cert. denied, 498 U.S. 1103 (1991), the Third Circuit held that determining whether an offense is a violent felony for purposes of 18 U.S.C. Sec. 924 requires looking at the fact of conviction and the statutory definition of the prior offenses of which the defendant was convicted, but not to any of the facts underlying those convictions. In O'Neal, 937 F.2d at 1372, the Ninth Circuit held that a conviction for assault with a deadly weapon under the California Penal Code qualified as a violent felony under Sec. 924(e) because an element of the offense was assault which involved the attempted use of force.
 
 
 96
 Gilbert was convicted of armed robbery in the Circuit Court of Branch County, Michigan. The essential elements of armed robbery in Michigan are: (1) an assault, (2) a felonious taking of property from the victim's person or presence, while (3) armed with a weapon described in the relevant statute. People v. Newcomb, 476 N.W.2d 749, 752 (Mich.Ct.App.1991). Under Michigan law, an assault is defined as any intentional unlawful offer of corporal injury to another person by force or force unlawfully directed toward the person of another, under circumstances creating the apprehension of imminent contact, coupled with an apparent ability to accomplish the contact. Espinoza v. Thomas, 472 N.W.2d 16, 21 (Mich.Ct.App.1991). Thus, armed robbery in Michigan also involves the use of force and hence qualifies as a violent felony under 18 U.S.C. Sec. 924(e). Therefore, the district court did not err in sentencing Gilbert as an armed career criminal.
 
 L.
 
 97
 Defendants Gilbert and Curtsinger argue that the district court erred in calculating their respective sentences under U.S.S.G. Sec. 2B3.1(6)(B). Section 2B3.1 applies to convictions for bank robbery under 18 U.S.C. Sec. 2113. The guideline section provides for a base offense level of 20, and the specific offender characteristics further provide that if the property of a financial institution was taken, the base offense level should be increased by two levels. Furthermore, Sec. 2B3.1(6)(B) provides that if the amount of loss from the robbery was more than $10,000 but less than $50,000, the base offense level should be increased by an additional one level. In this case, the district court determined that $5,744 in currency was taken from the bank during the robbery, and the district court added to that amount the value of the stolen S-10 pickup used as the getaway vehicle, which was calculated to be $6,825. Since the total loss was computed to be $12,569, the district court applied a one-level upward adjustment to Gilbert's and Curtsinger's total offense levels under Sec. 2B3.1, resulting in a total offense level for the armed robbery convictions of 23 for each.
 
 
 98
 Both Gilbert and Curtsinger filed an objection to the presentence report as to the inclusion of the value of the truck in the calculation of loss under Sec. 2B3.1(6)(B). In his brief on appeal, Gilbert has not stated specific reasons for his objection to the inclusion of the value of the truck in the calculation of loss; Curtsinger objects to the inclusion of the value of the truck in the calculation of loss, asserting that there is no evidence in the record that he knew the truck was stolen.
 
 
 99
 A district court's determination as to questions of fact in connection with sentencing are reviewed under a clearly erroneous standard. See United States v. Barrett, 890 F.2d 855, 867 (6th Cir.1989). However, a district court's application of the guidelines which involves mixed questions of law and fact is reviewed under a de novo standard. See United States v. Muhammad, 948 F.2d 1449, 1455 (6th Cir.1991), cert. denied, 112 S.Ct. 1239 (1992). The district court determined the valuation of loss under the commentary to Sec. 2B3.1. Application note 3 to U.S.S.G. Sec. 2B3.1 states that the valuation of loss is determined based upon the commentary to U.S.S.G. Sec. 2B1.1. U.S.S.G. Sec. 2B1.1, comment. (n. 2) provides: " 'Loss' means the value of the property taken, damaged, or destroyed.... In the case of a defendant apprehended taking a vehicle, the loss is the value of the vehicle even if the vehicle is recovered immediately."
 
 
 100
 The district court heard testimony from Jaggers and Odom that they stole the Chevrolet S-10 pickup in Knoxville, Tennessee, and used it to travel to Gilbert's home in Lexington. Gilbert and Jaggers also testified that this occurred well before they began the conspiracy to rob the Farmers Bank with Gilbert and Curtsinger.
 
 
 101
 Thus, the S-10 pickup was not stolen as part of the plan to rob the Farmers Bank. Accordingly, we conclude that the district court erred in including the value of the stolen S-10 pickup in calculating the offense level of Gilbert and Curtsinger. Therefore, the sentences imposed on Gilbert and Curtsinger are vacated, and the case is remanded for resentencing.
 
 III.
 
 102
 For the reasons stated, we AFFIRM the convictions of Gilbert and Curtsinger. However, because we conclude that the district court erred in including the value of the stolen S-10 pickup in calculating Gilbert's and Curtsinger's offense level, we VACATE the sentences imposed by the district court and REMAND for resentencing.